545 P.2d 979

**R. S. FULTON and Velma Fulton, his wife, Appellants,**

**v.**

**Reid WOODFORD and Harleysville Mutual Insurance Company, a Pennsylvania Corporation, Appellees.**

**No. 1 CA–CIV 2837.**

Court of Appeals of Arizona, Division 1, Department B.

Feb. 10, 1976.

Rehearing Denied March 26, 1976.
Review Denied April 13, 1976.

**18**

Treon, Warnicke & Dann, P.A., by Richard T. Treon and Michael J. Valder, Phoenix, for appellants.

Gust, Rosenfeld, Divelbess & Henderson, by Richard A. Segal, Phoenix, for appellee Woodford.

Renaud, Cook, Miller & Cordova, P.A., by J. Gordon Cook, Phoenix, for appellee Harleysville.

## OPINION

JACOBSON, Presiding Judge.

This appeal arises from the granting of directed verdicts at the close of plaintiffs' case brought against their insurance company for breach of its duty of good faith and against their former attorney for alleged malpractice.

This is the fourth appellate review [1] of the issues arising out of an accident occurring on December 4, 1963, involving a

---

1. See *Fulton v. Johannsen*, 3 Ariz.App. 562, 416 P.2d 983 (1966) ; *Fulton v. Woodford*, 17 Ariz.App. 490, 498 P.2d 564 (1972) ; and *Harleysville Mut. Ins. Co. v. Employers Cas. Co.*, 467 F.2d 665 (9th Cir. 1972).

truck owned and driven by William Patterson, which resulted in the death of Arnold Johannsen. Patterson at this time was "operating" under a Certificate of Convenience and Necessity issued by the Arizona Corporation Commission and held by appellants, R. S. Fulton and Velma Fulton (Fulton). At the time of the accident, Fulton was insured by appellee, Harleysville Mutual Insurance Company (Harleysville) under a general automobile liability policy having $100,000.00 limits. As a result of the Johannsen heirs bringing a wrongful death action against Fulton and others, the defense of Fulton was tendered to his insurer, Harleysville, who accepted this defense and employed appellee, Reid Woodford (Woodford) as attorney to represent Fulton. Because Johannsen's claim exceeded the coverage available under the Harleysville policy, Fulton was advised he should employ his own counsel. This Fulton did and those personal attorneys contacted Woodford and requested that they be informed of all proceedings.

Subsequently, Harleysville came to the conclusion that the only reason its policy covered the Patterson-Johannsen accident was because of the "automatic coverage" rider required by the Arizona Corporation Commission, since the Patterson truck was not listed on the Harleysville policy. The "automatic coverage" rider extended coverage to all losses, damages, injuries or deaths occurring by reason of Fulton's operation as a motor carrier under his Certificate of Convenience and Necessity. Because of this conclusion as to coverage, Harleysville further concluded that it would have the right to be reimbursed by Fulton for any losses or expenses incurred by it as the result of the Johannsen litigation. As a result of these conclusions, Woodford, by letter directed to Fulton and Fulton's personal attorneys, advised Fulton that the defense undertaken was under a

reservation of rights to seek "reimbursement for all losses and expenses incurred by reason of said lawsuit."[2] After receipt of this "reservation of rights" letter, neither Fulton nor his personal attorneys objected to Woodford's continued representation of Fulton.

The Johannsen litigation subsequently resulted in a jury verdict of $200,000.00 against Fulton and Patterson. Patterson had, previous to trial, obtained a covenant not to execute upon payment to Johannsen of $10,000.00. This verdict and judgment were subsequently affirmed in *Fulton v. Johannsen*, 3 Ariz.App. 562, 416 P.2d 983, *supra*. Following litigation in federal court by Fulton and Harleysville on issues not pertinent to this appeal,[3] Fulton brought this action against Harleysville for breach of its duty to give equal consideration to their interests in not settling the wrongful death case prior to trial and against Woodford for malpractice. As previously indicated, the trial court granted directed verdicts in favor of both Harleysville and Woodford at the close of Fulton's case.

FULTON—HARLEYSVILLE CLAIM

Fulton admits that prior to the verdict in the Johannsen litigation, Johannsen's attorney never made a firm offer to settle that litigation within policy limits, nor did Fulton or his personal attorneys demand that Harleysville settle the litigation within policy limits. The only reference on the part of Johannsen's counsel to settlement occurred at the time of the pre-trial conference when the trial court suggested a settlement within the $60,000.00 to $65,000.00 range. Although both counsel evidenced their willingness to settle, Johannsen's attorney informed Woodford that if he would make an offer from $85,000 to $100,000 they could negotiate up from there since the case was worth in excess of

2. Harleysville's subsequent attempt at reimbursement from Fulton was denied on the theory that the Patterson truck was a "substitute automobile" under the policy for which coverage was available. *See Fulton v. Woodford*, 17 Ariz.App. 490, 498 P.2d 564, *supra*.

3. *See, Harleysville Mutual Ins. Co. v. Employers Cas. Co.*, 467 F.2d 665, *supra*.

$100,000.00.[4] These "negotiations" were never conveyed to Fulton nor his personal attorneys. Prior to the pretrial conference, Woodford's overtures to settlement with Johannsen's attorney met with the reply "read the prayer" which was for $600,000.00.

However, Fulton asserts that Harleysville liability for "bad faith" arises from any one of three premises: (1) The fact that Harleysville was defending Fulton under a "reservation of rights"; (2) that Harleysville had an affirmative duty to explore settlement possibilities within policy limits; and (3) That Harleysville had a duty to inform Fulton and his personal attorneys of "settlement negotiations" which duty was breached. Harleysville on the other hand, contends it simply cannot be guilty of "bad faith" as to its insured in the absence of an offer or demand by someone to settle the litigation within policy limits which did not occur during the course of this litigation.

Before discussing the lack of settlement offer or demand issue, the court desires to put at rest the so-called "conflict of interest" issue raised by Harleysville's "reservation of rights" letter. What is stated here as to Harleysville is equally applicable to attorney Woodford, although the claim against him is discussed separately in this opinion. Obviously, any insurance company or an attorney employed by an insurance company who undertakes to represent an insured under a reservation of the right to subsequently seek reimbursement from that insured for any losses arising out of that representation has a "conflict of interest" with that insured. Equally as obvious is the principle that the insured being fully informed of that conflict of interest may consent to that representation under those circumstances. See, Canon 6, Canons of Professional Ethics of the American Bar Association. In this case, it is clear that Fulton and his personal attorneys acquiesced and consented to the continued representation afforded by Harleysville after the "reservation of rights" letter was sent. Under these circumstances, this conflict of interest in and of itself will not constitute bad faith on the part of the insurer or malpractice on the part of the attorneys. We do not mean to intimate that such a conflict of interest may not properly be considered by a jury in evaluating other acts of the insurance company or the attorney which might bear on the issue of bad faith or malpractice. Rather, we are holding that such a conflict under the circumstances presented here cannot in and of itself constitute bad faith or malpractice.

We turn then to an issue of whether an offer to settle by the claimant or a demand for settlement within policy limits by the insured is a prerequisite to a suit against the insurance company for breach of its duty to give equal consideration to the interests of its insured.

It is important at this juncture to define the "bad faith" of the insurer which will subject it to liability to its insured in excess of its policy limits. As was stated in *Farmers' Insurance Exchange v. Henderson*, 82 Ariz. 335, 313 P.2d 404 (1957):

> "It occurs to us that when the insurer is defending litigation against the insured, employs attorneys to represent the interests of both and has sole power and opportunity to make a settlement which would result in the protection of the insured against excess liability, common honesty demands that *it not be moved by partiality to itself nor be required to give the interests of the insured preferential consideration.* A violator of this *rule of equality of consideration* cannot be said to have acted in good faith." (emphasis added) 82 Ariz. at 338–39, 313 P.2d at 406.

4. At the time of trial in this matter, Johannsen's attorney testified that if Harleysville had offered $75,000.00, he would have advised his client to accept. This willingness to accept $75,000.00 was never conveyed to Woodford or Harleysville.

This rule of equality of consideration was amplified in *General Accident Fire & Life Assur. Corp. v. Little,* 103 Ariz. 435, 443 P.2d 690 (1968) by making the objective test to be:

"When an insurance company evaluates a claim without looking to the policy limits and as though it alone would be responsible for the payment of any judgment rendered on that claim it views that claim objectively, and in doing so renders 'equal consideration' to the interests of itself and the insured." 103 Ariz. at 442, 443 P.2d at 697.

The question presented in this case is *when* does the duty of the insurer to give "equal consideration" arise. Harleysville cites the case of *Merritt v. Reserve Insurance Company,* 34 Cal.App.3d 858, 110 Cal.Rptr. 511 (1973) for the proposition that this duty only rises when there has been a firm offer to settle originating from the injured claimant. *Merritt* analyzes the duty to give equal consideration in terms of conflict of interest between the insurer and the insured, and concludes:

" . . . (1) the legal rules relating to bad faith come into effect only when a conflict of interest develops between the carrier and its insured; (2) a conflict of interest only develops when an offer to settle an excess claim is made within policy limits or when a settlement offer is made in excess of policy limits and the assured is willing and able to pay the excess." 34 Cal.App.3d at 877, 110 Cal.Rptr. at 523–24.

On the other hand Fulton calls the court's attention to the holding in *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 N.J. 474, 323 A.2d 495 (1974) which holds:

"We . . . hold that an insurer, having contractually restricted the independent negotiating power of its insured, has a positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage. Any doubt as to the existence of an opportunity to settle within the face amount of the coverage or as to the ability and willingness of the insured to pay any excess required for settlement must be resolved in favor of the insured unless the insurer, by some affirmative evidence, demonstrates there was not only no realistic possibility of settlement within policy limits, but also that the insured would not have contributed to whatever settlement figure above that sum might have been available." 65 N.J. at 496, 323 A.2d at 507.

The holding of *Rova Farms* would seem to indicate that the duty to give equal consideration arises any time there is a "realistic possibility" of settlement within policy limits. Or, if the insured is able to pay any excess the insurer in order to comply with the duty to give equal consideration must at least offer its policy limits. It would further appear under *Rova Farms* that absolute liability attaches to the insurer for failure to affirmatively pursue either of these alternatives.

The problem we have with the holding in *Rova Farms* is that, at least under Arizona law, it imposes a more onerous obligation upon the insurer to seek settlement, than is imposed where an actual offer of settlement within policy limits is made. Where a firm offer to settle within policy limits is made, the insurer, under Arizona law, is not absolutely required to accept that offer at the risk of exposure to liability in excess of policy limits. Rather, the issue is whether the insured rejected the offer in "bad faith". Moreover, mere mistakes in judgment on the insurer's part in rejecting the offer is not enough to show bad faith. *General Accident Fire & Life Assur. Corp. v. Little, supra.*

*Rova Farms* tacitly admits that the test espoused in that case is not compatible with the rule of equal consideration apparently adopted in its prior decision. For this reason, *Rova Farms* would impose absolute liability on insurance companies for

failure to offer policy limits in all cases where the ultimate verdict exceeds policy limits:

> "However, where the carrier chooses not to offer the limits of coverage, one wonders whether it should not bear the unhappy financial results of that unilateral decision, since it alone profits from the opposite result of the gamble." 65 N.J. at 500, 323 A.2d at 509.

While we can conceive of numerous policy reasons why such a rule should not be adopted, we need not discuss them for this is simply not the rule in Arizona. *Farmers' Ins. Exchange v. Henderson, supra; General Accident Fire & Life Assur. Corp. v. Little, supra; State Farm Auto Ins. Co. v. Civil Service Emp. Ins. Co.,* 19 Ariz. App. 594, 509 P.2d 725 (1973).

We therefore reject the absolute duty to initiate negotiations by the insurer espoused by *Rova Farms.* However, we do not read *Merritt* to mean that there is an absolute requirement that an offer to settle be a prerequisite to insurance company "bad faith" and that no circumstances exist under which an insurance company should not initiate settlement overtures. We agree with the *Merritt* analysis that the duty to give equal consideration arises only where a conflict of interest develops between the insured and the insurer. We further agree that this conflict of interest normally only arises where an offer is made by the claimant to settle within policy limits, or within the financial means of the insured, plus the policy limits. However, we believe that an additional area of conflict of interest is also potentially present. In those cases where there is a high potential of claimant recovery and a high potential of damages exceeding policy limits, the claimant may not be interested in settlement negotiations, especially where a financially responsible insured is present. In such a case, the insurer has nothing to lose by "going for broke" while the insured stands to suffer financially unless the matter is settled within policy limits or close thereto, which settlement negotiations are completely within the hands of the insurer. Obviously, a conflict of interest under these circumstances is present between the insured and his insurer. Under these circumstances, the better reasoned cases impose upon the insurer the obligation to initiate and attempt settlement and the failure to do so may constitute "bad faith" which would subject the insurer to liability in excess of policy limits. *State Auto Ins. Co. v. Rowland,* 221 Tenn. 421, 427 S.W.2d 30 (1968); *Bell v. Commercial Insurance Co.,* 280 F.2d 514 (3 Cir. 1960).

We therefore hold, in the absence of a demand or request to settle within policy limits or within the limits of the insured's financial ability, plus policy limits, that a conflict of interest would give rise to a duty on behalf of the insurer to give equal consideration to the interest of its insured where there is a high potential of claimant recovery and a high probability that such a recovery will exceed policy limits. It is important to remember that this holding only goes to the issues of *when* the duty to give equal consideration arises, not what factors, including failure to initiate settlement, would give rise to a breach of that duty.

Since Fulton concedes that Johannsen's attorney never made a firm offer to settle, nor did Fulton demand that Harleysville settle, under the rule which we adopt here it was incumbent upon Fulton to present evidence that Johannsen had a high probability of recovering in his action and that his recovery had a high probability of exceeding policy limits. We need only look at the last element of this test to decide Harleysville liability.

The testimony presented by Fulton was that Woodford thought if a plaintiffs' verdict was obtained it would be in the range of $10,000.00 to $25,000.00 with extremes of $50,000.00. The adjuster for the insurance company did not anticipate a verdict in excess of $40,000.00. The claims manager for Harleysville opined a range of

$35,000.00 to $40,000.00 with $50,000.00 topside, but a verdict with a runaway jury would not exceed $70,000.00 to $80,000.00. The trial judge suggested exploring settlement in the $60,000.00 to $65,000.00 range. One of Mr. Fulton's personal attorneys admitted advising Mr. Fulton that in all probability the verdict would not exceed $100,000.00. Even Johannsen's attorney, although he testified he thought the jury might well return a verdict between $100,000.00 and $300,000.00 testified he would not have been surprised if the verdict was $75,000.00 and if it had been $100,000.00, he would have been the host of a gathering where glasses clinked.

The only evidence that it could be reasonably foreseen that the verdict would exceed $110,000.00 (the amount of combined coverage available) came by way of an offer of proof in connection with Fulton's motion to reopen testimony after the close of his case and after the trial court had granted a directed verdict for Woodford. Objections were made to the reopening, primarily on the basis that other witnesses would have been cross-examined differently if this evidence had come in the normal sequence of plaintiffs' case. The trial court rejected this offer, and under the circumstances of this case, we are of the opinion that she was well within her discretion in doing so. *Kreisman v. Thomas,* 12 Ariz.App. 215, 469 P.2d 107 (1970).

We therefore hold that the duty imposed upon an insurance company to give equal consideration to its insured did not arise in this case. We thus do not need to determine whether the failure to convey to Fulton the nebulous "settlement negotiations" arising out of the pre-trial conference constituted a breach of that duty.

## FULTON—WOODFORD CLAIM

Turning to Fulton's claim for malpractice against Woodford, the attorney employed by Harleysville to represent him,

counsel for Woodford candidly admits that evidence was presented in Fulton's case in chief from which a jury could conclude that Woodford's conduct in handling certain aspects of the *Johannsen v. Fulton* litigation may have fallen below the applicable standard of care.[5] Woodford contends however that there was no evidence that his alleged failure to comport with the applicable standard of care resulted in damage to Fulton. Fulton admits this is true insofar as Woodford's trial representation is concerned, but alleges that Woodford was also guilty of malpractice in not effectuating a settlement of the Johannsen-Fulton litigation and that expert testimony was elicited to show damage to Fulton in this regard. In particular, Fulton points to the following testimony:

"Q: I'm getting toward the end, whether you had an opinion as to whether Mr. Woodford's failure to prepare a case properly as you have testified to and his failure to settle the case, as you have testified to, proximately caused any damage or injury to Mr. Fulton?

"A: Yes, I have an opinion.

"Q: What is that?"

[objection made and overruled]

"A: In my opinion, it did. Obviously the failure to settle exposed Mr. Fulton to another $100,000.00 that he wouldn't have been exposed to, plus all of the subsequent problems that have developed over the years in this case."

The expert's conclusion that failure to settle a case which subsequently results in a verdict in excess of insurance coverage damages the defendant-litigant is obvious. The real question to be answered in the case of a failure to settle, at least from the attorney's standpoint, is what authority (amount of money) did he have for settlement purposes and did his alleged malpractice cause the amount of money available for settlement to be inadequate. As regards the amount of Woodford's authority, the evidence is clear that Harleysville had

---

5. Woodford's counsel is quick to point out that this failing is only conceded because of

the posture of this case—a directed verdict at the close of plaintiffs' case.

only authorized $15,000.00 for settlement purposes. The record is equally clear that the case could not have been settled for this amount.

During the course of the litigation Woodford advised Harleysville that the Johannsen jury might "compromise" and in that event the amount of the potential verdict might be in the $70,000.00 to $80,000.-00 range and as a result of this advice the local claim adjuster recommended to Harleysville that the reserve be increased to $50,000.00. There is no evidence that, assuming this reserve of $50,000.00 was offered in settlement to Johannsen, that it would have been accepted.

More importantly, the record is completely silent as to whether any of the alleged acts of malpractice on Woodford's part, if they had not occurred, would have caused Harleysville to authorize an amount of money (whatever that figure might be) in settlement that Johannsen would have accepted.

To adopt Fulton's thesis in its entirety would require this court to hold that in every case in which an attorney is unable to obtain a settlement within policy limits that attorney would be guilty of malpractice. This we refuse to do. The evidence presented is that Woodford simply did not have the money authorization from Harleysville to settle this case and there is no showing that, absent his alleged malpractice, Harleysville would have given him sufficient authorization to settle, even within Johannsen's attorney's later declaration that he would have settled for $75,000.00.

Under this state of the facts, the trial court properly granted Woodford's motion for a directed verdict, especially where on appeal Fulton has abandoned any contention that Woodford's trial conduct caused Fulton damage.

By reason of the foregoing, the judgments of the trial court are affirmed.

HAIRE, C. J., Division 1, and EUBANK, J., concurring.