UNIFIED SEWERAGE AGENCY OF WASHINGTON COUNTY, OREGON, a municipal corporation and County Service District, on behalf of and for the use and benefit of Teeples & Thatcher Inc., a corporation, Plaintiffs-Appellees,

v.

JELCO INCORPORATED, a corporation, and Seaboard Surety Company, a corporation, Defendants-Appellants.

No. 78–1920.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 15, 1980.

Decided June 1, 1981.

Robert D. Maack, Salt Lake City, Utah, argued for defendants-appellants; Wayne Wadsworth, Watkiss & Campbell, Salt Lake City, Utah, Lindsay, Hart, Neil & Weigler, Portland, Or., on brief.

Dwight L. Schwab, Schwab, Burdick & Hilton, Daniel J. Seifer, Portland, Or., for plaintiffs-appellees.

Before GOODWIN, FLETCHER and PREGERSON, Circuit Judges.

GOODWIN, Circuit Judge.

Jelco moved to disqualify the plaintiff's law firm on the theory that the attorneys were suing their own client in violation of Canons 4, 5 and 9 of the Code of Professional Responsibility of the State of Oregon (1980).[1] The trial judge denied the disqualification motion and Jelco appealed.

We treat the appeal as a petition for mandamus.

Jelco, based in Salt Lake City, was the prime contractor on a sewer plant project in Oregon. Teeples & Thatcher was the subcontractor for concrete work, and Ace Electric Co. was an electrical subcontractor. Kobin & Meyer is a Portland law firm experienced in representing construction companies. Kobin & Meyer had represented Teeples & Thatcher for ten years prior to this litigation.

In 1975, a dispute arose between Ace Electric and Jelco over Ace's claim for additional compensation under its subcontract. Ace contended that a change Jelco made in suppliers constituted a change in the terms of the subcontract. Jelco's Salt Lake City counsel, one Beesley, and another Jelco agent contacted Paul Meyer of Kobin &

---

1. *Cord v. Smith*, 338 F.2d 516 (9th Cir. 1964), *clarified*, 370 F.2d 418 (1966), involved an appeal from the denial of a motion to disqualify plaintiff's attorney. The court rejected the plaintiff's argument that state law applied. It said:

"[W]e do not think that the rule of *Erie Railroad Co. v. Tompkins*, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, compels the federal courts to permit, in proceedings before those courts, whatever action by an attorney-at-law may be sanctioned by the courts of the state. When an attorney appears before a federal court, he is acting as an officer of that court, and it is that court which must judge his conduct." 388 F.2d at 524.

In this case, the United States District Court for the District of Oregon has adopted as its rules the disciplinary rules of the State Bar of Oregon. *See* Local Rule 3(d) of the District Court for the District of Oregon. Therefore, in deciding whether the district court properly denied Jelco's motion to disqualify the plaintiff's law firm, we must decide whether the district court properly applied the Code of Professional Responsibility adopted by the State Bar of Oregon. *See Chugach Elec. Ass'n v. U.S.D.C. for the District of Alaska*, 370 F.2d 441, 442 n.1 (9th Cir. 1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967).

We express no opinion on the law to apply where the district court has not designated the applicable rules of professional responsibility (*e. g.*, state law, the Model Code of Professional Responsibility, or a federal common law of professional responsibility).

Canons 4, 5 and 9 of the Code of Professional Responsibility adopted by the Oregon State Bar, and the disciplinary rules pertaining to those canons, are identical to the canons and disciplinary rules contained in Canons 4, 5 and 9 of the American Bar Association's Model Code of Professional Responsibility (1980). Hence, our discussion refers to decisions from jurisdictions adopting Canons 4, 5 and 9 of the Model Rules and to ABA opinions.

The reporter for the ABA Committee that drafted the Code of Professional Responsibility recently noted that the Code's Disciplinary Rules were drafted for use in disciplinary proceedings and were not intended to be used as rules governing disqualification motions. Sutton, *How Vulnerable is the Code of Professional Responsibility?*, 57 N.C.L.Rev. 497, 514–16 (1979). Nevertheless, the Code will continue to provide guidance to the courts in determining whether a case would be tainted by the participation of an attorney or firm as shown by the District of Oregon's Local Rule 3(d).

Meyer in mid-1975, and asked that firm to join in Jelco's representation in the Ace Electric controversy.

Meyer told Beesley that Kobin & Meyer represented Teeples & Thatcher in what was then an embryonic dispute between Teeples & Thatcher and Jelco. Teeples & Thatcher's expressions of dissatisfaction with Jelco's scheduling and sequence of concrete work had reached the stage of lawyer discussions. Beesley nonetheless recommended to Jelco management that Kobin & Meyer be retained to assist in the Ace Electric litigation. Jelco's management, with full knowledge of Jelco's potential conflict with Teeples & Thatcher on the same project, and with full knowledge of Kobin & Meyer's long-standing relationship with Teeples & Thatcher, retained Kobin & Meyer.

In mid-1976, after a proposed settlement of the Teeples-Jelco dispute collapsed, Meyer told Beesley that the Teeples-Jelco dispute could ripen into a lawsuit. Meyer asked Beesley, and through him, Jelco's management, to re-evaluate whether Jelco wished Kobin & Meyer to continue to represent Jelco in the Ace Electric litigation. Meyer made it clear that if it came to a choice, Kobin & Meyer preferred to keep Teeples as a client. Jelco, through Beesley, replied unequivocally that it desired Kobin & Meyer to continue as counsel in the Ace litigation regardless of what happened in the Jelco dispute with Teeples & Thatcher.

The liability issues in the Ace litigation were tried in July 1976, and were determined adversely to Jelco. In December 1976, Kobin & Meyer filed an action for Teeples & Thatcher against Jelco.

In March 1977, with the damages issue in the Ace litigation still to be tried, Meyer again asked Beesley and Jelco's house counsel if Jelco desired to have Kobin & Meyer continue to represent Jelco against Ace. Meyer repeated his firm's expressed desire to avoid prejudicing Kobin & Meyer's representation of Teeples. Jelco again decided to continue with Kobin & Meyer in the Ace litigation.

In May 1977, Jelco discharged Beesley, obtained new Salt Lake City counsel, and discharged Kobin & Meyer from the Ace Electric litigation as soon as a substitute attorney could take over that case. In December 1977, Jelco filed this motion to disqualify Kobin & Meyer from further representation of Teeples & Thatcher in the action against Jelco.

## I. JURISDICTION

■ Denial of a motion to disqualify counsel is not an appealable order under the test set forth in *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. ——, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981); *Chugach Elec. Ass'n v. United States D. C. for Dist. of Alaska*, 370 F.2d 441 (9th Cir. 1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 40, 19 L.Ed.2d 71 (1967); *Cord v. Smith*, 338 F.2d 516, 521 (9th Cir. 1964), *clarified*, 370 F.2d 418 (1966). *See also, United States v. State of Wash.*, 573 F.2d 1121, 1122 (9th Cir. 1978) (order denying motion to disqualify a judge is not appealable).

From time to time, however, this circuit has treated an appeal from a nonappealable order as a petition for a writ of mandamus and has undertaken discretionary review under the All Writs Act, 28 U.S.C. § 1651 (1976). Whether we will do so in a particular case depends upon whether the order qualifies for extraordinary relief under the guidelines set forth in *Bauman v. United States Dist. Court*, 557 F.2d 650 (9th Cir. 1977). Those guidelines are:

" . . . (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. . . . (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. . . . (3) The district court's order is clearly erroneous as a matter of law. . . . (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. . . . (5) The district court's

order raises new and important problems, or issues of law of first impression . . . ." (Citations omitted) 557 F.2d at 654–55. The *Bauman* court emphasized that all factors would not be relevant in every case, and that the factors might point in different directions in any one case.

■ Mandamus relief is appropriate here.[2] First, Jelco has no other adequate means of seeking relief. A denial of a motion to disqualify is not an appealable order, and this court has held that certification under 28 U.S.C. § 1292(b) is not available. *Trone v. Smith*, 553 F.2d 1207 (9th Cir. 1977). Second, Jelco could suffer irremediable damage if forced to wait until after trial to appeal. Any advantage Kobin & Meyer possesses as a result of its representation of Jelco could be put to use at trial. Information once used or exposed would not be forgotten and could be used against Jelco on retrial. More important, the public perception of the profession could be damaged.

If the district court's refusal to disqualify Kobin & Meyer is an error, it comes under the purview of review for errors of law.[3]

Finally, we note that this circuit has not heretofore addressed the issues raised in this case. They are important. The profession and the public will benefit by clear direction from this court. This case is, therefore, appropriate for mandamus relief.

## II. THE MERITS

■ The trial court viewed the case as one involving an attorney's acceptance of employment adverse to a *former* client, and therefore tested Kobin & Meyer's actions against the standards set forth in Canon 4. In general Canon 4 prohibits an attorney from divulging confidences and secrets of a client. Under Canon 4 an attorney may not represent interests adverse to a former client if the factual context of the later representation is similar or related to that of the former representation. *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980). *See generally, Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 270–71 (D.Del.1980).

■ The case, however, is one in which the attorney undertook representation adverse to a *present* client. The questions

2. After this case was argued and submitted, the appellee filed a motion to dismiss the appeal on the authority of *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. ——, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). In *Firestone*, the Supreme Court said that mandamus was not the appropriate device by which to review the denial of the motion of attorney disqualification. It noted that:

"Petitioner has made no colorable claim that the harm it might suffer if forced to await the final outcome of the litigation before appealing the denial of its disqualification motion is any greater than the harm suffered by any litigant forced to wait until the termination of the trial before challenging interlocutory orders it considers erroneous."

*Firestone* is distinguishable. As the subsequent discussion in the text indicates, the harm in this case is greater than that suffered by an ordinary litigant forced to wait until the termination of the trial before challenging interlocutory orders it considers erroneous. Using the *Bauman v. United States Dist. Court*, 557 F.2d 650, 652 (9th Cir. 1977), guidelines, we have determined that this is an appropriate case for review. This case falls within that relatively narrow class of cases in which resort to man-

damus is appropriate in order to avoid irreparable injury resulting from delaying review until after a final judgment.' *See generally*, Note, *The Appealability of Orders Denying Motions for Disqualification of Counsel in the Federal Courts*, 45 U.Chi.L.Rev. 450, 476–79 (1978) (cited with approval in *Firestone Tire, supra*, 101 S.Ct. at 676 n.13).

3. It is true that this opinion examines whether the district court abused its discretion by refusing to disqualify Kobin & Meyer. Nevertheless, because we decide as a matter of law that DR5–105(B) and (C) do not create a *per se* rule against dual representation in unrelated matters of clients with adverse interests, we view the case as one involving a question of law which is suitable for review on a writ of mandamus. *Cf. Allied Chemical Corp. v. Daiflon, Inc.*, —— U.S. ——, —— n.3, 101 S.Ct. 188, 191 n.3, 66 L.Ed.2d 193 (1980) (while suggesting that the court might in certain circumstances review a discretionary decision on a writ of mandamus, the court here did not have an adequate record to do so) *with* this case. An adequate record exists to review the abuse of discretion as well as the question of law.

thus raised are more appropriately treated under Canon 5.[4] In contrast to representation undertaken adverse to a *former* client, representation adverse to a *present* client must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients. *See* American Bar Foundation, *Annotated Code of Professional Responsibility* 229 (1979); *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2nd Cir. 1976). *See also, Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 271 (D.Del. 1980).

> Disciplinary Rule 5–105(B) provides that: "A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C)." Code of Professional Responsibility of the State of Oregon (1980).

In *International Business Machines Corp. v. Levin*, 579 F.2d 271 (3rd Cir. 1978), the Third Circuit did not require that "adverse effect" be specifically demonstrated. It presumed that adverse effect resulted when an attorney took an adverse position to a present client. We agree that a specific adverse effect need not be demonstrated to trigger DR5–105(B) if an attorney undertakes to represent a client whose position is adverse to that of a present client. *See also In re Hedrick*, 258 Or. 70, 481 P.2d 71, 73–74

(1971) (attorney's legal relationship with client provided him with information which would adversely affect client in action brought against client by the attorney). Accordingly, Kobin & Meyer's dual representation of Teeples & Thatcher and Jelco triggers DR5–105(B) because the representation is presumed to affect adversely Kobin & Meyer's representation of each.

Teeples & Thatcher argues, however, that Kobin & Meyer should not be disqualified under DR5–105(B) because of the exception set forth in DR5–105(C). To avoid disqualification under DR5–105(B), an attorney must satisfy DR5–105(C)'s two conditions.[5] First, each client must consent to the multiple representation after full disclosure of the risks. Second, it must be "obvious" that the attorney can adequately represent the interests of each client.

### A. *Consent.*

The leading case on the meaning of "consent" in Canon 5 of the disciplinary rules of the State Bar of Oregon is *In re Boivin*, 271 Or. 419, 533 P.2d 171 (1975). The court stated that the consent must be an "informed consent" made after full disclosure of all of the material facts. 533 P.2d at 174. The court further said:

> "To satisfy the requirement of full disclosure by a lawyer before undertaking to represent two conflicting interests, it is not sufficient that both parties be informed of the fact that the lawyer is undertaking to represent both of them,

---

4. Teeples & Thatcher argue that the "present-client approach" is inapplicable here because Jelco has dismissed Kobin & Meyer from its employ. Jelco correctly cites *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 435 F.Supp. 84, 95 (S.D.N.Y.), *aff'd in part, rev'd in part on other grounds*, 567 F.2d 225 (2nd Cir. 1977), for the proposition that the present-client standard applies if the attorney simultaneously represents clients with differing interests. This standard continues even though the representation ceases prior to filing of the motion to disqualify. If this were not the case, the challenged attorney could always convert a present client into a "former client" by choosing when to cease to represent the disfavored client.

5. Disciplinary Rule 5–105(C) provides that:
   "In the situations covered by DR–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." Code of Professional Responsibility of the State of Oregon (1980).

but he must explain to them the nature of the conflict of interest in such detail so that they can understand the reasons why it may be desirable for each to have independent counsel, with undivided loyalty to the interests of each of them." *Id.*

■ Jelco asserts that it did not give "informed consent" because Kobin & Meyer merely "informed" it of the conflict, rather than explained to it the "implications" of the conflict. The district court, on the other hand, found that "there was an informed and knowing waiver by Jelco of any conflict or apparent conflict...." This finding does not offend Fed.R.Civ.P. 52(a).

The record shows that Jelco knew from the beginning that Kobin & Meyer represented Teeples & Thatcher in a long-standing client relationship and that Teeples & Thatcher was involved in an embryonic dispute with Jelco. Jelco also knew that Kobin & Meyer would accept Jelco as a client only if that relationship would not inhibit Kobin & Meyer in continuing to act as Teeples & Thatcher's counsel.

As the dispute between Teeples & Thatcher and Jelco developed, Kobin & Meyer twice alerted Jelco's counsel to the potential conflict and asked whether Jelco wished to continue Kobin & Meyer's retainer. After consulting with Jelco's management, Jelco's counsel assured Kobin & Meyer that Jelco wished Kobin & Meyer to continue representing Jelco.

■ We have no doubt that Jelco consented to the representation after full disclosure was made to Jelco and its own attorney.[6] The record shows that after Kobin & Meyer's disclosure, Jelco discussed the two actions and the possible conflict which would result with its own attorney, and then agreed to Kobin & Meyer's multiple representation. Consent was expressed not just on one occasion, but on two occasions.

Thus, the "consent" prong of DR5–105(C) is satisfied.

### B. *"Adequate Representation".*

■ The requirements of DR5–105(C) are not satisfied, however, by a mere showing of consent after full disclosure. The rule also requires that it be "obvious that [the lawyer] can adequately represent the interest of each [client]...." As the Oregon Supreme Court said in *In re Porter*, 283 Or. 517, 584 P.2d 744, 749 n.5 (1978), "[t]his is troubling language." The *Porter* court acknowledged, but did not resolve, the very issue confronting the court in this case—the meaning of the "adequate representation" part of DR5–105(C). The court said:

> "Because we have found that the full disclosure requirement of DR 5–105(C) was not met, we need not address the apparent further requirement of DR 5–105(C) that it be 'obvious that he [the lawyer] can adequately represent the interest of each.'

This is troubling language. The Bar contends that DR 5–105(C) states a two-part test. The issue of consent after full disclosure is not even reached until the initial requirement that 'it is obvious that he [the lawyer] can adequately represent the interest of each' is satisfied. The Bar argues that this requirement embodies the policy that differing interests may be represented only in rare cases. The following ethics opinions provide support [for] the Bar's position by treating the requirement that adequate representation

---

**6.** Jelco obviously no longer consents to Kobin & Meyer's representation of Teeples & Thatcher. Our analysis nonetheless turns on the effectiveness of Jelco's consent, however, because Jelco would be estopped from revoking its consent by everyone's reliance on its long-standing position.

Jelco has also argued that it was unaware of the conflict and that its counsel could not bind Jelco on the question of dual representation. We are not prepared to so hold. The district court apparently treated the agency question as settled by general principles of agency, and counsel have cited to us no law that calls for a re-examination of this issue on the present record.

be obvious as a separate standard: Opinions of the Committee on Legal Ethics of the Oregon State Bar numbers 218 and 376; ABA Formal Opinion number 331 (12/15/72); ABA Informal Opinions numbers 1235 (8/24/72) and 1282 (11/21/73). To read the language of DR 5–105(C) literally, however, would make the representation of conflicting interests nearly impossible. The difficulty lies in the word 'obvious.' Once it is shown that the exercise of the lawyer's independent professional judgment would be or would likely be adversely affected (DR 5–105(A)), how could it ever be *'obvious'* that he could adequately represent the interest of each party?" 584 P.2d 749, n.5.

Our analysis of the history of DR5–105(C), the structure of the Code, and the relevant policy considerations convinces us that the latter approach mentioned by the *Porter* court (*i. e.,* that if adverse affect is shown, it is never *obvious* that an attorney can adequately represent both) is not the correct approach to DR5–105(C).

1. *Legislative History of DR5–105(C).*

The history of the consent provision in the Code of Professional Responsibility's conflict of interest section indicates that consent was never intended to be meaningless or ineffective. Canon 6 of the 1908 Code of Professional Responsibility,[7] provided that:

"It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client required him to oppose."[8]

Although Canon 6 seemingly allowed multiple representation whenever the clients consented, the courts have interpreted it in a more restrictive manner.[9] In *Kelly v. Greason,* 23 N.Y.2d 368, 378–79, 244 N.E.2d 456, 462, 296 N.Y.S.2d 937, 945–46 (1968), for example, the court remanded on the issue of whether there was consent, but indicated in dicta that even with consent multiple representation is not always appropriate. The court noted that although Canon 6 expresses the general policy that a client who is fully cognizant of potential or actual conflicts is entitled to take his chances, multiple representation is not always allowed. The court stated that instances where the multiple representation would not be allowed would be when the public interest was involved or where the likelihood of prejudice to one party is extremely great. 23 N.Y.2d at 378, 244 N.E.2d at 462, 296 N.Y.S.2d at 945–46. *See, e. g., In re A. and B.,* 44 N.J. 331, 209 A.2d 101 (1965) (held, no conflicting dual representation, but a municipality's attorney may not also represent a land developer in that municipality. Consent is irrelevant when public interest is involved). Indeed, Henry Drinker, one of the leading authorities on the old Code, argued that "[Canon 6] does not sanction representation of conflicting interests in every case where such consent is given, but merely forbids it except in such cases." H. Drinker, *Legal Ethics* 120 (1953).

Despite the restrictive interpretation of Canon 6's expansive language, consent was

---

7. For a brief history of the development of the 1907 Code of Professional Responsibility—the first of the ABA—*see* H. Drinker, *Legal Ethics* 23–25 (1953).

8. *See Drinker, supra,* note 7, at 311.

9. *See, e. g., Jedwabny v. Philadelphia Transp. Co.,* 390 Pa. 231, 135 A.2d 252, 254 (1957), *cert. denied,* 355 U.S. 966, 78 S.Ct. 557, 2 L.Ed.2d 541 (1958) (held, no abuse of discretion to grant a new trial because the litigant did not have full knowledge of the conflict, but stating that some conflicts are so critically adverse that representation is not allowed); ABA Comm. on Professional Ethics, Formal Opinions No. 132 (1935); ABA Comm. on Professional Ethics, Informal Opinions No. 1157 (1970); Opinions of the Comm. on Legal Ethics of the Oregon State Bar, No. 135 (1964) (and opinions cited therein).

still available to justify representation which would otherwise be improper. *See, e. g.,* Opinions of the Comm. on Legal Ethics of the Oregon State Bar, No. 57 (1957) (citing Canon 6 to say that with consent, an attorney may represent an insurance company and also sue it in an unrelated case on behalf of another client); *Arden v. State Bar of California,* 52 Cal.2d 310, 341 P.2d 6 (1959) (held, multiple representation of adopting parents and natural mother was not improper even though a conflict later developed because the attorney had obtained consent). Moreover, the ABA committee repeatedly refused to approve an amendment deleting the "express consent" clause in Canon 6. *See* H. Drinker, *Legal Ethics* 120, n.16 (1953); ABA Comm. on Professional Ethics, Informal Opinions No. 296 (unpublished, cited in ABA Opinions on Professional Ethics p. 28 (1967)).

Thus, Canon 6 of the old Code of Professional Responsibility contemplated that consent would be available to authorize multiple representation which would otherwise be inappropriate.

■ In 1969, a new Model Code of Professional Responsibility was enacted. Disciplinary Rule 5–105(C), which differed from old Canon 6 in several respects, provided that:

"[A] lawyer may represent multiple clients if it is obvious that he can ade-

quately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent judgment on behalf of each."

DR5–105(C) has a broader scope than Canon 6. Canon 6 only applied to "conflicting interests" which arose when the lawyer had a "duty to contend for that which duty to another client required him to oppose." DR5–105(C), in contrast to Canon 6, applies whenever the attorney's representation of one client is likely to be adversely affected by his representation of another client,[10] or when it would involve him in representing "differing interests."[11] Moreover, whereas Canon 6 on its face would have allowed representation of conflicting interests if there were "consent after full disclosure," DR5–105(C) requires that it also be "obvious"[12] that an attorney can "adequately represent" the clients with differing interests. The changes in the new Code appear to be changes in substance, not merely form.

The case law and bar association opinions have continued, however under DR5–105(C), to allow multiple representation in certain situations if there has been consent after full disclosure. *See* Opinions of the Comm. on Legal Ethics of the Oregon State Bar, No. 218 (1972) (attorney can represent both parties in a divorce if there are no

10. *See* the text of DR5–105(B), quoted on page 5, *supra,* and DR5–105(A) quoted in n.10, *infra.*

11. DR5–105(A) provides:
"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR5–105(C)."
"Differing interests" is defined in the Code as: "[E]very interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest. . . . "

12. DR5–105(C) underwent one significant change during the drafting process. In the

Tentative Draft, the rule read "a lawyer may represent multiple clients if a lawyer of ordinary prudence would believe that he could adequately represent the interest of each. . . . " In the Preliminary Draft, the words "a lawyer of ordinary prudence would believe he could" were replaced by the current wording, "it is obvious that he can." *See* American Bar Foundation, *Annotated Code of Professional Responsibility,* Textual & Historical Notes p. 242 (1979). The Annotation notes that some confusion over the meaning of "obvious" has occurred. *Id.* at 243. Without belaboring the point, we think "obvious" must refer to an objective standard under which the ability of the attorney adequately to represent each client is free from substantial doubt.

children and if there is no property of significant value); *Fulton v. Woodford*, 26 Ariz.App. 17, 545 P.2d 979, 982 (1976) (insurer's reservation of rights created a conflict of interest, but dual representation of insured and insurer was proper because there was consent; thus, no malpractice or bad faith cause of action available to insured against insurer); *Matter of Farr*, 264 Ind. 153, 340 N.E.2d 777, 782–83 (1976) (held, in a case involving a conflict against insurer and insured, that case did not fall within category of cases where multiple representation is absolutely prohibited; thus, representation would have been proper had disclosures been made, but none were); *see also, In re Hansen*, 586 P.2d 413, 415 (Utah 1978) (held, attorney must return fee where he did not obtain consent to advocate against a present client in an unrelated manner); *Matter of Kali*, 116 Ariz. 285, 569 P.2d 227, 229 (1977) (dual representation improper because no consent); *In re Taylor*, 567 F.2d 1183 (2nd Cir. 1977) (if consent is given, the court may not unilaterally interfere with a person's choice of counsel).

### 2. *Structure of the Code.*

Giving effect to both elements of DR5–105(C) is not inconsistent with the remainder of the Code of Professional Responsibility. We note that although an attorney's actions are generally governed by the Code, with the attorney deciding the propriety of his actions, a few limited situations exist under the Code in which client consent justifies certain actions. *See* DR5–104(A) (business transactions with a client); DR5–101(A), DR5–105(A) and (B) (declining or discontinuing employment when judgment on behalf of a client is likely to be affect-

ed); DR4–101(B) (revealing confidences of a client); DR5–105 (settling similar claim of clients). DR5–105(C) is one of those few cases when consent can justify otherwise improper actions. This section has remained in the Code despite objections.[13]

### 3. *Policy Grounds.*

■ Policy reasons support our decision not to interpret DR5–105(C)'s "adequate representation" language in such a way as to abolish consent. It is true that from its representation of Jelco in the *Ace* matter, Kobin & Meyer was likely to gain information and insights from Jelco about such things as Jelco's institutional attitudes towards negotiation and settlement and Jelco's method of doing business. Such information undoubtedly could prove useful to an opponent. Nevertheless, while the practice of suing a client can be neither condoned nor encouraged,[14] we are not prepared to enunciate a *per se* rule that a client must forego in all circumstances his choice of a particular attorney merely because there is the foreseeability of a future conflict with one of the attorney's existing clients.

It is true that the court has an obligation to safeguard the integrity of the judicial process in the eyes of the public. *See Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 267 (D.Del.1980); *see also, Silver Chrysler Plymouth, Inc. v. Chrysler Motor Corp.*, 518 F.2d 751, 754, 759 (2nd Cir. 1975), and at p. 759 (Adams, J., concurring), *overruled on other grounds Armstrong v. McAlpin*, 625 F.2d 433 (2nd Cir. 1980), *vacated McAlpin v. Armstrong*, —— U.S. ——, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). But the impact upon the public's respect for lawyers may be too speculative to justify overriding the client's

---

**13.** *See* H. Drinker, *Legal Ethics* 120, n. 16 (1953); ABA Committee on Professional Ethics, Informal Opinions No. 296 (unpublished, cited in ABA Opinions on Professional Ethics p. 28 (1967).

**14.** The Code, the cases and the commentators agree that if there is any doubt as to whether

multiple representation would be appropriate, the attorney should decline the representation. *See, e. g., Complaint of Hershberger*, 288 Or. 559, 606 P.2d 623, 624 (Or.1980) (and cases and authorities cited therein); *International Business Machines Corp. v. Levin*, 579 F.2d 271 (3rd Cir. 1978); EC 5–15.

right to take a calculated risk and, with full knowledge, engage the attorney of his choice. We do not find it necessary to create a paternalistic rule that would prevent the client in every circumstance from hiring a particular attorney if the client knows that some detriment may result from that choice in a later suit. Clients who are fully advised should be able to make choices of this kind if they wish to do so. Our responsibility is to preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the avoidance of representations where undivided loyalty is impossible. *See Trone v. Smith*, 621 F.2d 994, 1001 (9th Cir. 1980); *Silver Chrysler, supra*, 518 F.2d at 753. We think the Code strikes a balance on the side of an individual's right to choose his own counsel and against a *per se* rule forbidding multiple representation. *See also, In re Taylor*, 567 F.2d 1183, 1191 (2nd Cir. 1977) (stating that once the court decides that client consent was given, the court is without power to unilaterally obstruct the choice of counsel).[15]

### 4. Defining "Adequate Representation".

Of course, saying that there will be situations in which it is appropriate for an attorney to represent a client who is suing another client is much easier than defining when the representation will meet DR5–105(C)'s "adequacy" requirements. Under both Canon 6 and DR5–105(C), the courts have consistently said that representation is unavailable where the public interest is impaired or where there is a great likelihood that one party will be prejudiced.[16] Examples of such cases include a government attorney's representation of a client who is suing the government,[17] and an attorney's representation of both the plaintiff and the defendant in a particular suit.[18] We believe the "public interest" and "prejudice" language used on occasion by the courts is merely another way of saying that "adequate representation" could not be provided in those cases.

None of the cases, however, sets forth the specific factors to use in determining when the representation is adequate. In determining whether it is obvious that an attorney can represent adverse parties, the court should look at factors such as: the nature of the litigation; the type of information to which the lawyer may have had access; whether the client is in a position to protect his interests or know whether he will be vulnerable to disadvantage as a result of the multiple representation; the questions in dispute (e. g., statutory construction versus disputes over facts) and whether a government body is involved.

Thus, the court will undoubtedly look at some of the factors which are considered in deciding whether representation against a former client is appropriate. *See Gas-a-Tron of Arizona v. Union Oil of California,*

---

15. We do not express any view about whether such conduct could serve as a basis for disciplinary proceedings. The Code's purpose is to guide lawyers in ethical conduct and to serve as a disciplinary code. Some of the same considerations are present in the litigation context, but the court is in addition concerned with the balancing of hardships to the litigants. We think it possible that, in unusual circumstances, counsel might properly be subjected to discipline and yet be allowed to continue representing the client in on-going litigation.

16. *See, e. g., Kelly v. Greason*, 23 N.Y.2d 368, 378–79, 244 N.E.2d 456, 462, 296 N.Y.S.2d 937, 945–46 (1968); *In re A. and B.*, 44 N.J. 331, 209 A.2d 101 (1965). *See generally*, Drinker, sup.a, note 7, at 120 (and opinions cited therein).

17. *See, e. g.,* Opinions of the Committee on Legal Ethics of the Oregon State Bar, No. 45 (1957).

18. *See, e. g., Sapienza v. New York News*, 481 F.Supp. 676, 680 (S.D.N.Y.1979); *see also, Rice v. Baron*, 456 F.Supp. 1361, 1374 (S.D.N.Y. 1978) (attorney disqualified where he represented two plaintiffs with possible counterclaims against each other; no showing of consent, but dicta that even if there had been consent there would have been a problem); *see generally*, ABA Committee on Professional Ethics, Informal Opinions, No. 1157 (1970) (consent insufficient where multiple representation could lead to breach of client confidences).

534 F.2d 1322 (9th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *T. C. Theater Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265, 268 (S.D.N. Y.), *reh. den.*, 125 F.Supp. 233 (1953).

### 5. *The Merits of this Case.*

██ We now consider whether it was "obvious" that Kobin & Meyer could adequately represent each of its clients in this instance. As a preliminary matter, we must decide whether the findings of fact made by the district court may be relied upon in deciding whether it was obvious that Kobin & Meyer could provide adequate representation. The district court found that there was "no substantial or close relationship between the subject matter of the Ace litigation and the subject matter of the Teeples & Thatcher litigation," and "no evidence to justify a finding that Kobin & Meyer [had] any special insight or advantage arising on account of its representation of Jelco in the Ace case which would give to Teeples & Thatcher any unfair advantage over Jelco." These findings of fact are consistent with Fed.R.Civ.P. 52(a).

Although the two actions arose out of the same construction contract between Jelco and Unified Sewerage, the nature of the cases is quite different. The action which Kobin & Meyer handled for Jelco involved only a narrow issue of contract interpretation. The issue was whether the use of a certain aeration equipment manufacturer constituted a change in Jelco's subcontract with Ace because Ace allegedly had to provide different and additional equipment than originally planned. The facts were virtually undisputed.

The action which Kobin & Meyer handled for Teeples & Thatcher and against Jelco involved the scheduling and sequencing of concrete work which was to be performed by Teeples & Thatcher for Jelco. Each party claimed that the other party delayed and interfered with its work. The only information furnished by Jelco to Kobin & Meyer in connection with the first action

concerned the pre-bid proposals on aeration equipment and electrical work, project specifications for aeration work, the subcontract negotiations between Jelco and Ace, the shop drawings and submittals prepared by Ace and expert testimony relative to costs differentiations for electrical installations. We conclude that the district court's findings of fact are not clearly erroneous.

██ The next question this court must address is whether the district court abused its discretion in denying the motion to disqualify, given the above findings of fact. The appropriate standard for reviewing a district court's ruling on a motion for attorney disqualification is whether the ruling was an abuse of discretion. *See Gas-a-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322, 1325 (9th Cir. 1976). The rationale is that the primary responsibility for controlling the conduct of lawyers practicing before the district court lies with that court, not with us. *Id.; see Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980).

We find that the district court did not abuse its discretion. It is sufficiently obvious, for the purposes of the canon, that Kobin & Meyer could adequately represent both Jelco and Teeples & Thatcher in the several actions. The litigation in the two cases was quite different; one involved a question of contract interpretation and the other was a highly disputed factual claim concerning each party's performance. Although one umbrella contract covered each case, the individual contracts involved were quite different. As the findings of fact indicate, Kobin & Meyer did not have access to any specific information that would help Teeples & Thatcher prevail against Jelco (other than general information concerning the personality of a client, which is always helpful in later suits against that client). Jelco, fully advised by its regular counsel, was in a position to know all the risks it was taking in employing Kobin & Meyer.

We find no facts that suggest that Kobin & Meyer would be tempted to "soft pedal"

the rights of one client in these cases so as not to jeopardize the position of another client. Nothing suggests that Kobin & Meyer had an incentive *not* to represent zealously the interests of each client in their respective cases. Accordingly, we find that it was as "obvious" as necessary that Kobin & Meyer could adequately represent Jelco and Teeples & Thatcher within the meaning of the canon.

### III. CANON 9 AND THE APPEARANCE OF IMPROPRIETY

Jelco has argued that Kobin & Meyer should be disqualified because the challenged multiple representation carries the appearance of impropriety. The point does, of course, raise questions. But, to paraphrase the *Silver Chrysler* court, we do not believe Canon 9 was intended to override the delicate balance created by Canon 5 and the decisions thereunder. *Silver Chrysler, supra,* 518 F.2d at 757. Having decided that Canon 5 was written to allow multiple representation in exceptional cases if all clients consented after full disclosure and if the attorney could adequately represent both parties, we do not read Canon 9 as an implied repeal of the multiple representation language in Canon 5 because it has "the appearance of impropriety."

The district court's failure to disqualify Kobin & Meyer was not an abuse of discretion on the facts of this case. Jelco consented after full disclosure and the court found that Kobin & Meyer could adequately represent both parties.

Accordingly, the ruling of the district court will not be disturbed.

Affirmed.