Emmett S. JOBE, et al., Plaintiffs,

v.

INTERNATIONAL INSURANCE COMPANY, Defendant.

No. Civ. 93–0074 PHX CAM.

United States District Court, D. Arizona.

March 7, 1995.

Merwin D. Grant, Kenneth B. Vaughn, Grant Williams Lake & Dangerfield P.C., Phoenix, AZ, for plaintiffs.

Edward Francis Ruberry, Jeffrey Alan Goldwater, George J. Manos, James A. Lupo, Jr., Bollinger Ruberry & Garvey, Chicago, IL, Robert J. Bruno, Phoenix, AZ, for defendant.

## ORDER

MUECKE, District Judge.

Having considered plaintiffs' motions for partial summary judgment and defendant International Insurance Company's motion for summary judgment, the Court concludes as follows:

### Background

This case involves a dispute regarding insurance coverage under a policy issued to the law firm of Lee, Stegall and Katz [LSK] for malpractice claims asserted by plaintiffs Jobe. Plaintiffs sued the law firm in state court for tax advice given by a deceased partner for malpractice. The law firm settled for $3 million and assigned its rights, if any, against International to the Jobes through a *Damron* agreement. The Jobes subsequently filed this action against International alleging breach of contract and bad faith.

International has filed a motion for summary judgment alleging that it had no duty to defend and never prevented nor obstructed any settlement. Plaintiffs have filed to partial motions for summary judgment alleging that liability and damages cannot be relitigated. Plaintiffs have also filed a partial motion for summary judgment seeking judgment on the defendant's recision claim.

### Summary Judgment

Summary judgment may be granted if the movant shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure.

■ The disputed fact(s) must be material. *Id.* Substantive law determines which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ The dispute must also be genuine. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. In a civil case, the question is:

whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

■ The moving party who has the burden of proof on the issue at trial must establish all of the essential elements of the claim or defense for the court to find that the moving party is entitled to judgment as a matter of law. *Fontenot v. Upjohn,* 780 F.2d 1190, 1194 (5th Cir.1986); *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986). However, the moving party need not disprove matters on which the opponent has the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, summary judgment is proper if the nonmoving party

fails to make a showing sufficient to establish the existence of an essential element of his case on which he will bear the burden of proof at trial. *Id.*

### Undisputed Facts

The following facts relevant to these motions are undisputed [1]:

### I. Plaintiffs' motion for partial summary judgment regarding relitigation of damages

This is a bad faith action against an insurer arising from an underlying legal malpractice action *Jobe v. Lee.* SOF 1. In *Jobe v. Lee,* the Jobes sued for malpractice involving alleged improper tax advice. SOF 2. The Jobes sought approximately $2 million as compensation for the amount they had to pay to the federal and state tax authorities, plus other damages that caused the Jobe's claim to total approximately $4 million. SOF 3. The *Jobe v. Lee* case was settled by a final entry of judgment in the approximate amount of $3 million and an assignment of the insured's rights to the Jobes. SOF 4.

In this case, International contends that any tax benefits the Jobes received would diminish the Jobes' damages. SOF 5. In *Jobe v. Lee,* the Jobes successfully moved for summary judgment on the issue and Judge Rapp ruled that the defendants were not entitled to an offset of the Jobes' damages by the amount of any tax benefits or profits they might have realized as part of the underlying transactions. SOF 6. International's expert in this case, David Frazier, has not researched the question of whether tax benefits are considered when measuring a plaintiff's damages. SOF 7. Mr. Frazier is not an expert on the legal measure of damages. SOF 8. Mr. Frazier is of the opinion that tax benefits should be a legitimate aspect of damage calculations. SOF 9. Mr. Frazier contends any award the Jobes would have received in the *Jobe v. Lee* case would not be taxable income to them. SOF 10. In *Jobe v. Lee,* the Jobes claimed that any damages awarded would be taxable. SOF 11. The

defendants in *Jobe v. Lee* did not argue that any damages awarded to the Jobes would not be taxable.

### II. Plaintiffs' motion for partial summary judgment regarding relitigation of liability

One defense raised in *Jobe v. Lee* was the statute of limitations. SOF 2. In *Jobe v. Lee,* the defendants filed a motion for summary judgment on the statute of limitations. SOF 3. After the motion for summary judgment was denied, the defendants in *Jobe v. Lee* moved for reconsideration. SOF 4. After the motion for reconsideration was denied, the defendants in *Jobe v. Lee* moved to bifurcate the trial on the statute of limitations issues. SOF 5.

In *Jobe v. Lee,* the Jobes contended that if their claim against Larry Lee was time barred, Stegall and the other lawyers at LSK committed malpractice by failing to advise the Jobes of the statute of limitations at the time Stegall told the Jobes to make a claim against Lee, and by failing to urge them to seek independent counsel immediately because of the statute of limitations issue. SOF 6.

### III. Plaintiffs' motion for partial summary judgment for rescission

This action is a bad faith action against the insurance company defendant for actions arising out of the underlying malpractice action in *Jobe v. Lee.* SOF 1. In *Jobe v. Lee,* the Jobes sued for malpractice involving improper tax advice and claimed damages of approximately $4 million. SOF 2. The insured, Lee, Stegall & Katz [LSK], represented the Jobes in connection with an Internal Revenue Service audit and administrative appeal of the Jobes' income tax returns from approximately 1985 through August of 1989, when the appeal was settled. SOF 3. Charles Stegall was the managing partner of LSK from January 1987 through August of 1989. SOF 4. Larry Lee, the Lee in the LSK name, died in November of 1987. SOF 5. Prior to his death, Lee represented the

---

1. The Court includes only those facts in which the parties come forward with admissible evidence. In addition, if a party states that a fact is disputed but comes forward with no admissible evidence to establish the dispute, that fact is considered undisputed.

Jobes and structured certain transactions which were the subject of an IRS audit. SOF 6. Until his death, Lee vigorously defended his structuring of the transactions with the IRS and assured the Jobes that they had nothing to worry about. SOF 7. After Lee's death, Stegall and Michael Kempner, an LSK associate, continued the representation of the Jobes through the administrative appeal. SOF 8. LSK continued to represent the Jobes on numerous other matters and was counsel for the Jobes and their business interests in all legal matters not related to tax issues after the settlement with the IRS. SOF 9.

On or about January 20, 1989, Stegall completed an application for professional malpractice insurance for International. SOF 10. One of the questions on the application stated:

19. Is the Applicant, its predecessor firms or any lawyer proposed for this insurance aware of any circumstance, act, error or omission which may result in a claim against them?
___ Yes. ___ No.

SOF 11. Stegall answered no. SOF 12. This answer is the entire basis of International's counterclaim for rescission in this action. SOF 12. International contends Stegall had notice of the *Jobe v. Lee* claim on January 20, 1989. SOF 14. In August of 1989, the Jobes reached as settlement with the IRS on advice of Stegall and others. SOF 15.

At the meeting where settlement with the IRS was discussion, Stegall advised Jobe that he should make a claim against LSK based on Lee's acts, including his conflict of interest and a certain indemnity letter that raised a possible fraud claim by the IRS. SOF 16. Jobe consulted with his CPA, Randy Fitzpatrick, and Fitzpatrick authored a draft of a demand letter. SOF 17. Stegall reviewed the demand letter, found it unclear and informed Fitzpatrick. Fitzpatrick then sent another letter to Stegall. SOF 18. Fitzpatrick sent the revised demand letter, dated November 20, 1989, to Stegall. SOF 19. Stegall forwarded a copy of the demand letter to his two insurers, Home Insurance Company and International. SOF 20. The

*Jobe v. Lee* litigation commenced in January of 1990. SOF 21. The Jobes' counsel's concern about the statute of limitations prompted the filing at that time. SOF 22. The *Jobe v. Lee* litigation was settled in October of 1992. SOF 23.

In December of 1992, this action was commenced. SOF 24. In January of 1993, International first asserted a right to rescind the policy based on the alleged false answer to the above question. SOF 25. On June 28, 1989, Debbie Price, International's claims supervisor, wrote a note to the file:

Reviewed file & CFR

-Insured's 6/29/89 letter states they became aware of the potential error in late 1988. Policy became effective 2/10/89.

-Dave-

We need to check the following:

1) Review insured's application and see if they reported this as a potential claim and review signature date. If not listed, why didn't insured report this? ...

SOF 26. On August 18, 1989, Dave Bostwick, International's first adjuster assigned to the claim wrote in response as follows:

"Checked application and no mention of this claim made." SOF 27. Schirott testified that he had read the entire file and that he knew at least as early as April 1992 that Debbie Price had raised the prior notice issue in 1989. SOF 28.

On May 18, 1992, International's adjustor wrote:

Read file beginnings—claim has been open/reopen for a long time [.] Question is whether or not this is prior notice—question [sic] were raised by Price, not sure they were addressed by Bostwick.

SOF 29. In June of 1992, Walter Erdmanis wrote a note to the file:

Mike [Schirott] out—received message Chuck Stegall (insured) called. Angry that we did not respond to 6–5–92 letter[.] Reviewed file.

SOF 30. Walter Erdmanis, one of International's adjustors also wrote:

Mike [Schirott, an International adjustor], I didn't get into prior notice situation [during conversation with Stegall] let's discuss.

I though we might want to put our heads together on these approaches.

SOF 31.

International knew no later than April of 1992, that it would argue Stegall had prior notice of the *Jobe v. Lee* claim when he completed the application. Mike Schirott, one of International's adjustors, testified as follows:

[I]t has always been the contention that the malpractice of Lawrence Lee was back in the early '80s and that it was a known fact as the tax issue was being appealed prior to the application for insurance.

Just looking at it from as a reasonable person, if I had a scenario that I was appealing and if I lost, it could come to me because the advice was based on what I did, and I would certainly think that that is [sic] facts or circumstances giving rise to an potential for claim.

SOF 32. Schirott knew this in April of 1989. SOF 32.

In his deposition, Erdmanis testified that in May of 1992, International had internally taken the position that there would be no coverage until the prior notice issue was resolved. SOF 33. Erdmanis did not advise Stegall of the prior notice issue. Instead, he led Stegall to believe that International may be secondarily liable. SOF 34. Erdmanis testified about failing to advise Stegall International believed coverage might be precluded by prior notice:

I don't recall my mindset at the time. I was concerned with his concern about our apparent uncaring attitude or whatever, and I just wanted to talk to him, and I just wanted to talk to Fleming.

SOF 35.

LSK received a demand letter regarding the *Jobe v. Lee* matter, before the suit was filed, on or about November 20, 1989. SOF 36. LSK put International on notice of the *Jobe v. Lee* matter no later than December 6, 1989, when LSK asked for a renewal quote. SOF 37. International acknowledged the *Jobe v. Lee* claim on April 10, 1990. SOF 38. International has never alleged that the misrepresentation on the application was fraudulent. SOF 39.

On or about October 9, 1990, Stegall advised International that he was considering a *Damron* agreement. SOF 40. At that time, Stegall wrote to Home and copied Bostwick of International stating, "recent actions by Home have led me to believe that Home is trying to separate the interest of the Lee Estate from the interests of the various law firms." SOF 41. On February 6, 1992, Stegall informed International that the Jobes, "have in fact made allegations directly against the firm for actions occurring subsequent to the coverage date." SOF 42. Stegall did not know the Jobes' audit and appeal might lead to a claim at the time he completed the application on January 20, 1989. Rather, he testified that at the time he completed the application, "there was nothing to cause me to believe that there was a claim against Mr. Lee at that point." SOF 43.

## IV. Defendant's motion for summary judgment

The Home Insurance Company provided a policy of legal malpractice insurance to the law firm of Lee, Stegall & Katz with limits of $1 million, which contained an endorsement providing "unlimited tail" coverage to attorney Larry Lee for all claims arising from activities prior to his death. SOF 1.

International provided a policy of Lawyer's Professional Liability Insurance to the Lee, Stegall & Katz firm effective from February 10, 1989 to February 10, 1990, with limits of liability of $1 million. SOF 2. The International policy provides:

The Company shall pay on behalf of the Insured all sums in excess of the deductible which the Insured shall become legally obligated to pay as damages as a result of claims first made against the Insured and reported to the company in writing during the Policy period by reason of any act, error, omission or personal injury arising out of professional services rendered or which should have been rendered by the Insured or by any person for whose acts, errors, omissions or personal injuries of the Insured is legally liable, and arising

out of the conduct of the insured's professional as a Lawyer or Notary Public.

SOF 3.

The International policy contained an "Exclusion B" which excluded coverage under the policy for "any claim based upon or arising out of any act, error, omission or personal injury occurring prior to the effective date of this policy if the insured at the effective date knew or could have reasonably foreseen that such act, error, omission or personal injury might be expected to be the basis of a claim or suit." SOF 4. The International policy also contained an "Endorsement 2" which stated that "this Policy does not cover any claim or claims arising from or attributable to or based upon any act(s), error(s), omission(s), or personal injury(ies) committed or alleged to have been committed prior to the following retroactive date: 02/10/86." SOF 5. The International policy contained a "multiple insureds, claims and claimants provision" which stated:

> The inclusion of more than one Insured in any claim or the making of claims by more than one person or organization shall not operate to increase the limits of liability and deductible. Two or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim. All such claims whenever made shall be considered first made on the date on which the earliest claim arising out of such act, error, omission or personal injury was first made and all such claims are subject to the same limit of liability and deductible.

SOF 6. The International policy defined "Insured" as:

> A) the names insured as stated in the Declarations and any predecessor firm thereof;
> B) any lawyer or professional corporation who was or is a partner, officer, director or employee of the Named Insurer, but only as respects professional services rendered on behalf of the Named Insured or any predecessor firm thereof;
> C) any lawyer who was or is acting "of counsel" to the Named Insured, but only as respects professional services rendered

on behalf of the Named Insured or any predecessor firm thereof;

> D) any other present or former employee of the Named Insured or any predecessor firm thereof solely while acting on behalf of the Named Insured or an predecessor firm thereof;
> E) the heirs, executors, administrators and legal representatives of any insured in the event of an insured's death, incapacity or bankruptcy, but only as respects professional services rendered prior to such insured's death, incapacity or bankruptcy.

SOF 7. The International policy contained a condition regarding the Insured's duties in the event of a claim, which stated in part:

> As a condition precedent to the availability of coverage under this Policy, the Insurer's duties in the event of a claim are as follows:
>
> \* \* \* \* \* \*
>
> D) the insured shall not, without prior written consent of the company, make any payment, admit liability, settle claims, assume any obligations, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur any claims expenses on behalf of the Company.

SOF 8. The International policy contained a condition regarding action against the company which stated in part:

> No action shall lie against the Company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

SOF 9. The International policy contained an "other insurance" clause which provided:

> If there is other insurance applicable to a claim covered by this policy, this policy shall be deemed excess insurance over and above the applicable limits of liability of all such other insurance unless such other insurance is written only as specific excess

insurance over the limits of liability provided in this policy.

SOF 10.

Question 19 of the application signed by Charles T. Stegall, a partner in the firm asked, "Is the Applicant, its predecessor firms or any lawyer proposed for this insurance aware of an circumstance, act, error or omission which may result in a claim against them?" The answer on the application was "no." SOF 11. At that time, Stegall knew of the existence of an audit and possibly an appeal of the tax returns of Emmett and Billie Jobe and was aware that actions of his partner Larry Lee had become the subject of the audit and appeal. SOF 13.

Jobe, a cotton farmer and racetrack owner sought out the tax advice of Larry Lee, a well-known expert in such matters. SOF 14. As part of Lee's engagement to assist Jobe in minimizing Jobe's federal income tax exposure, Lee helped structure for Jobe three transactions including (1) the J/K partnership agreement; (2) CFC Plaza Acquisition; and (3) 1031 Exchange of CFC Plaza. SOF 14. The J/K partnership agreement was drafted by Lee in 1979 or 1980. According to the plaintiffs, Lee failed to include a negative capital restoration provision as part of that agreement, as required by law. SOF 15. The CFC Plaza purchase centered around the acquisition by Jobe of an office building in Phoenix known as the CFC Plaza. The structuring of this deal included the formation of several sham entities by Lee, including Sundown Properties Limited Partnership and the Reliable Trust Group. The creation of these entities was specifically to facilitate Jobe's amenability to certain tax deductions. SOF 16. The 1031 Exchange involved the disposition of the CFC Plaza in 1984. Section 1031 of the IRS code allows for an exchange of property in certain circumstances without that exchange being considered a taxable event. The plaintiffs alleged in the underlying case that Larry Lee failed to properly structure that exchange. SOF 17.

Beginning in 1984, the IRS initiated an audit of Jobe's income tax returns for the year 1982, and later expanded the audit to include the 1983 and 1984 tax returns. Part of the matters that were scrutinized by the IRS included the three transactions identified above. SOF 18. During 1987, on Lee's advice, Jobe appealed the IRS' ruling to that agency's appellate process. During the pendency of this administrative appellate process in November of 1987, Mr. Lee died. SOF 20. Stegall, the managing attorney for Lee, Stegall & Katz assumed responsibility for his firm's representation of Jobe in the IRS appeal process. SOF 21. In December of 1987, Jobe conferred with a Phoenix attorney Alfred J. Olsen regarding a potential malpractice claim that Jobe may have had against Larry Lee. Mr. Olsen was previously engaged by Jobe to act as an advisor regarding the handling and disposition of the IRS audit and appeal. SOF 22.

In August of 1989, the IRS appeal was settled between Jobe and IRS for a payment of $1,842,976.07 by Jobe to the United States. SOF 23. The IRS settlement was recommended to Jobe by Stegall, Olsen and others engaged to advise Jobe. These individuals unanimously agreed that the settlement was a reasonable disposition of the audit and appeal and was the best deal available to Jobe. SOF 24.

The Jobes filed the *Jobe v. Lee* complaint on January 31, 1990 in Maricopa County Superior Court alleging causes of action against Lee and the firm of Stegall & Kemper arising from Lee's structuring of the transactions, the representation during the IRS audit and administrative appeal and various breaches of professional duties during the process. SOF 25. The Home Insurance Company provided a defense to Lee and his estate but did not provide a defense to Stegall or his firm for any acts after Lee's death. SOF 26.

Stegall advised International of the *Jobe v. Lee* claim in December of 1989 when the firm applied for a renewal policy and in February of 1990. SOF 27. Stegall sent a copy of the *Jobe v. Lee* complaint to International, who received that complaint on February 26, 1990. SOF 28. In a letter dated April 18, 1990, Stegall informed International that the complaint had not yet been served but had only been filed to preserve that statute of limitations and that Home was representing

the firm. SOF 30. On or about October 5, 1990, the First Amended Complaint was filed in *Jobe v. Lee.* SOF 31.

Interrogatory answers of plaintiffs dated February 3, 1992 list numerous allegations of malpractice against Lee and the firm. On February 6, 1992, Stegall sent a letter to International, with a copy of the interrogatory answers. The letter provided:

Enclosed is a copy of a letter dated February 4, 1992 from Mr. Fleming, counsel in the *Jobe v. Lee* matter, and the attached Answers to Defendants' Interrogatories. In your letters to me dated January 24, 1990 and April 10, 1990, you indicated, based upon the nature of the claims, that the policy issued was secondary.

As explained in the letter from Mr. Fleming, counsel for Mr. Jobe has now taken the alternative approach that if in fact Mr. Lee did not commit malpractice, then somehow someone else within our firm did.

The purpose of this letter is to put you on notice that they have in fact made allegations directly against the firm for actions occurring subsequent to the coverage date. I suggest you discuss this matter directly with either Mr. Feming or Mr. Silver to determine the appropriate course of action.

SOF 32. Plaintiffs' allegations in *Jobe v. Lee* centered on Stegall and Lee and LSK attorney Michael Kempher's alleged failure to advise Jobe of the possible effect of any statutes of limitations governing malpractice claims; their alleged failure to advise Jobe of the doctrine of laches; their failure to advise Jobe that settling with the IRS might waive and/or release any malpractice claims that Jobe would have had against Lee; their failure to advise of a potential conflict of interest; and their failure to advise Jobe that the settlement with the IRS was problematic. SOF 34.

On March 25, 1992, International discussed the information provided in the letter and on April 2, 1992 requested additional information concerning how the alleged malpractice of Lee would fall under the coverage of the International policy. SOF 35. On April 29, 1992, International once again requested further information on how the practice of Lee would be covered under the International policy. SOF 36. By letter of May 12, 1992, counsel for the law firm advised that plaintiffs' position prior to February 1992 was that all acts and omissions complained of were done by Lee and that plaintiffs had made a settlement demand of $2 million which had been rejected. SOF 37.

On or about August 19, 1992, the Jobes served their disclosure statement on defendants. SOF 39. There are numerous statements of fact propounded by the defendants regarding the disclosure statement in which defendants appear to argue that the statement did not include any damages by anyone other than Lee. However, a review of the complete disclosure statement including the prefatory statement establishes that it included claims against Kempner and Stegall for breach of fiduciary duty in failing to apprise the Jobes of the significant risk of the huge tax and interest assessment as a result of Lee's malpractice; failing to disclose that settling with IRS would release any claim against the estate of Lee; failing to warn Jobe of the statute of limitations and laches defenses; failing to timely apprise the Jobes of the significant risk of a fraud claim because of the indemnity agreement; failure to timely advise the Jobes that by representing both Klimnow and Jobe in the audit and appeal they were in a conflict of interest situation failing to disclose to the Jobes that Lee had acted in a conflict of interest situation by drafting the indemnification agreement between Klimow and Jobe; and failing to advise the Jobes the IRS settlement was ill advised and they could do better in federal court. SOF 40–42. On September 8, 1992, counsel for the law firm discussed the status of the case with International and forwarded documentation by letter, including the disclosure statement, on that date to International. SOF 43.

When asked whether he felt that International had failed to acknowledge coverage, Stegall responded "well, when I send a certified letter to my insurer, in essence, saying please step forward and help me out in this jam and I get no response, that's how I interpret it, yes." SOF 62. Arthur Gorman,

Stegall's independent counsel for purposes of the settlement of *Jobe v. Lee* is an experienced attorney in the area of insurance bad faith. SOF 63. Groman opined that International acted in bad faith with regard to Stegall. SOF 64. Gerald Strick is one of the Jobe's experts in this case and a former Maricopa County Superior Court Judge. He is a practicing lawyer with experience in the area of legal malpractice and insurance bad faith litigation. SOF 65. Strick also opined that International acted in bad faith. SOF 66.

International's contract provides that the company *shall:*

> Have the right and duty to defend, including selection of counsel and arbitrators, in the Insured's name and on the Insured's behalf any claim for damages against the Insured, even if such claim is groundless, false or fraudulent and have the right and duty to make such investigation and negotiation of any claim it deems expedient.

SOF 67. Under the policy, a claim is defined as:

> a demand received by the insured for damages, including, but not limited to, the service of suit or institution of arbitration proceedings against the insured.

SOF 68.

In his letter of February 6, 1990, Stegall informed International, in addition to requesting its opinion regarding coverage, that the statute of limitations could be an issue in the case. SOF 69. On April 10, 1990, International confirmed that it received notice of the Jobes' claims. SOF 70. As the *Jobe v. Lee* case progressed, on October 9, 1990, International was informed that the defense being funded by Home was "trying to separate the interests of the Lee estate from the interest of the various law firms." SOF 71. On February 4, 1992, International was informed that discovery had revealed the Jobes were alleging malpractice directly against the lawyers for acts subsequent to February 10, 1986. SOF 72. On April 29, 1992, International responded with a letter. SOF 73. Internally, International's adjustor noted in his file:

> It is my recommendation that we maintain our current position of *pointing to the Home Insurance Company as the primary carrier* for this claim. If [sic] such time as the information develops which would *force us to revise our position* we were [sic] certainly able to do so.

SOF 74 (emphasis added).

On May 8, 1992, Stegall responded to International's April 29, 1992 letter and explained that the Home lawyers had raised the statute of limitations defense on behalf of Larry Lee and that the Jobes alleged Stegall was negligent by failing to advise the Jobes to file an action immediately to avoid the limitations defense. Stegall again asked International to get involved and talk with the Home lawyers. SOF 75. Windt characterized the defenses proffered by Home on behalf of LSK and Stegall as "silly" and "stupid." SOF 76. Windt acknowledged that one defense proffered by the Home lawyers, that the Jobes' settlement with the IRS was unreasonable, shifted the consequences of any negligence by Lee to Stegall. SOF 77. Windt also acknowledged that the statute of limitations defense raised by the Home lawyers would shift the consequences of Lee's malpractice to Stegall and LSK. SOF 78. Home covered Lee's estate, but not the firm or Stegall for any acts after Lee's death. SOF 79.

Gorman believed that Stegall had been negligent with regard to failing to advise the Jobes of the statute of limitations. SOF 80. Stegall himself recognized his exposure for that failure. SOF 81. The policy provides:

> The Company shall pay on behalf of the insured all sums ... as a result of *claims* first made against the insured and *reported* to the Company *in writing during the policy period ...*

SOF 82.

International first received notice of the Jobes' claim no later than December 6, 1989 when Stegall forwarded information forwarded information regarding the renewal of the policy. SOF 83. International responded to the application to renew by declining to renew the policy. SOF 84. The policy has a specific provision for "potential" claims that requires more detailed reporting:

If, during the policy period, the Insured first becomes aware of an act ... and gives written notice ... during the policy period, any claim subsequently made ... shall be considered to have been made during the policy period.

The policy further provides that:

written notice of a potential claim shall include:

A) the specific act, error or omission or personal injury; and

B) the injury or damage that may reasonably result; and

C) the circumstances by which the Insured became aware of the act ...

SOF 85.

On April 18, 1990, Stegall informed International that his law firm continued to represent the Jobes on all their business matters and legal matters other than tax issues. SOF 86. The Jobes had not expressed any dissatisfaction before Stegall told them to make a claim and by continuing to use the firm evidenced that they had not lost confidence in the firm as legal counsel. SOF 86. The only "penalties" the Jobes had paid by the time the application was completed totaled $123. Stegall testified a penalty of $123 "wouldn't have cause me great concerns." SOF 87. Likewise, the back taxes that the Jobes agreed to pay at the time of the application totaled $2,451, and did not cause great concern. SOF 87. The cause of the $2,451 in taxes and $123 in penalty arose principally because the Jobe's accountant, Patrick Johnson, did not include certain items of income on the Jobes' 1984 income tax return, specifically: (1) insurance recovery; (2) agricultural subsidy; (3) capital gains; and (4) net operating loss deduction. SOF 88. The penalty related to the back taxes on the unreported income. SOF 88. Lee had nothing to do with the failure to report these items. SOF 89.

International's policies and procedures for the processing of professional malpractice claims are contained in a manual titled "Crum & Forester Managers Corporation Professional Claims Handling Manual" [Manual]. SOF 91. International's manual provides, in its preface, in part:

Full compliance will also be given to requirements of Unfair Claims Practices Acts wherever enacted.

\* \* \* \* \* \*

It is understood that a factual investigation must first be conducted before a decision can be reached. This investigation should be conducted as promptly as possible.

\* \* \* \* \* \*

It is expected that we will always use our best efforts to consistently deal with insureds and claimants in a morally responsible manner and thus help to do away with public hostility and antagonism that may adversely affect the image of our company.

A prompt and courteous response to inquiries from all persons must be our practice. Delays in communication or failure to return messages creates an additional problem to the insured or claimant beyond the occurrence of the loss and sometimes unnecessarily complicates its settlement.

\* \* \* \* \* \*

All claims personnel are required to comply with the Claims Practices Standards as set forth in the Statement of Principles on Rights and Duties of Lawyers, Insurance companies, and Adjusters as well as Unfair Claim Practices Acts where applicable.

Adherence to the above claims philosophy will ensure good faith handling in all circumstances.

\* \* \* \* \* \*

Sound claims decisions don't just happen. They are based on informed factual investigation, proper reporting and documentation, along with fair and rational evaluation. These elements combined with assertive case management will result in a fair and equitable claims disposition for the insurance consumer and the insurance company and claimants. With this objective in mind, the manual was developed.

... [i]t is fully expected that [this manual] will be daily reference source for all phases of claims handling. The manuals have been physically designed so that all claims

handlers will find it convenient to utilize the manual as a working guide on individual claims assignments.

SOF 92.

International's Manual section regarding investigation provides, in part:

All investigations should be objective. The investigation should not be slanted to favor either the claimant or the insured. We merely collect the available facts and record them. We do not disregard information which is favorable or unfavorable to either the company or the insured. To keep the investigation objective we should avoid hearsay information, opinions, assumptions and conclusions. Our information should be direct, firsthand knowledge from an identified source.

A common problem encountered with investigating a claim is to decide how much investigation is necessary ... There are, however, some guidelines that can be followed.

First, we only investigate to the point where the preponderance of evidence allows us to make a decision in one direction or another (denial or payment). Our attention should focus on the critical facts, which, in the exercise of good judgment, will allow us to arrive at a sound conclusion as soon as possible.

Second, the more questionable the liability, the more investigation is required. These are the claims most likely to end in litigation. We must be prepared to defend them if necessary. *Further, the company has a duty to the insured to provide an investigation and the best defense possible.*

Third, the more potential value a claim has, the more in-depth the investigation. Recognizing a serious case and setting priorities must be developed.

\* \* \* \* \* \*

What follows are a series of outlines designed to guide the [adjustor] in the performance of an investigation. Note that the Basic Initial investigation covers the *minimum* acceptable standards required on *all* liability claims.

SOF 93.

Stegall informed International that he expected them to indemnify him and the firm for any excess judgment after it failed to respond to his pleas for help. SOF 90. In his deposition testimony, Shirott stated he sent the International letter and admitted that he never followed up with even a phone call. SOF 94. On October 9, 1990, Stegall advised International of a possible *Damron* agreement. SOF 95.

In 1992, Jobe filed this action against International in Maricopa County Superior Court. SOF 57. International removed the action to federal court, filed it answer, affirmative defenses and counterclaim to the Jobe complaint. SOF 57–58. In November of 1993, Jobe moved to amend and this court granted the motion to amend on January 21, 1994. SOF 59. Count I of the First Amended complaint alleges that International is liable for breach of the policy. Count II alleges that International acted in bad faith. Count III seeks punitive damages. SOF 60. Count I of International's counterclaim alleges that the International policy is unenforceable because it was procured through misrepresentation. Counts II and III allege that Exclusion B and Endorsement II of the International policy exclude coverage for *Jobe v. Lee*. Count IV seeks recision based on an alleged misrepresentation. SOF 61.

### Discussion

## I. Are plaintiffs entitled to partial summary judgment regarding relitigation of the underlying case and damages?

Plaintiffs argue that they are entitled to partial judgment that the insurance company cannot relitigate the liability and damage issues of the underlying case. International concedes that it cannot relitigate liability and damages but argues that it may present the evidence to establish that the settlement was not reasonable. Plaintiffs reply that facts bearing on liability and damages and the risks of going to trial must be limited to those facts known to exist at the time of settlement.

█ This case involves a *Damron* or *Morris* agreement. In the *Damron* and *Morris* cases, the Arizona Supreme Court set forth the insurance law applicable to this case. Each party to an insurance contract assumes express obligations. The insurer expressly agrees to indemnify the insured if liabilities covered by the policy are established and expressly obligates itself to defend any claim potentially covered by the policy. *United Services Auto Ass'n v. Morris,* 154 Ariz. 113, 741 P.2d 246 (1987). When the insurer performs its obligation to defend, the insured must cooperate with the insurer, aid in the defense and may not settle with the claimant without breaching the cooperation clause unless the insurer first breaches one of its contractual duties. *Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969); *Morris,* 741 P.2d at 246. If the insurer performs its obligations, the cooperation clause applies with full force and settlement by the insured constitutes a breach of the policy. *Damron,* 460 P.2d 997; *Morris,* 741 P.2d at 246. However, when an insurer performs the duty to defend but reserves the right to deny the duty to pay or asserts a defense of reservation of rights or a nonwaiver agreement, the cooperation clause is narrowed and permits the insured to take reasonable measures to protect himself against the danger of personal liability. *Morris,* 741 P.2d at 252. The cooperation clause prohibition against settling without the insurer's consent only forbids an insured from settling claims for which the insurer unconditionally assumes liability under the policy. *Id.* Therefore, an insured being defended under a reservation of rights may enter into a *Damron* or *Morris* agreement without breaching the cooperation clause. Such agreements must be made fairly, with notice to the insurer, and without fraud or collusion on the insurer. *Id.*

█ Such settlement is binding on the insurer, if the insured or claimant shows that the settlement was reasonable and prudent. *Morris,* 741 P.2d at 253. The indemnitor must be given notice and an opportunity to defend. To establish that the settlement was reasonable and prudent, the indemnitee need not establish that he would have lost the case, but only that given the circumstances affecting liability, defense and coverage, the settlement was reasonable. *Morris,* 741 P.2d at 253. The test as to whether the settlement was reasonable and prudent is what a reasonably prudent person in the insured's position would have settled for on the merits of the claimant's case. This involves evaluating the facts bearing on the liability and damage aspects of the claimant's case, as well as the risks of going to trial. *Morris,* 741 P.2d at 254.

█ In this case, the insurance company argues that it can present new evidence on both the damages and liability issues as a basis to challenge the reasonableness of the settlement even though the issues were considered by the trial court in the underlying Superior Court action of *Jobe v. Lee.* The Arizona Supreme Court has addressed this issue and found that the insurance company does not have a right to relitigate liability or the amount of damages as such position would destroy the purpose served by allowing insured to enter into *Damron* agreements because claimants would never settle with insureds if they could never receive any benefit. *Morris,* 741 P.2d at 253. Rather, the insurer may litigate only whether coverage existed and whether the settlement was reasonable and prudent. The Arizona Court of Appeals has clarified that "liability" under *Morris* includes not only how the trier will view the facts but also how the court will apply the law. "What is foreclosed is the right to claim that no liability existed in the original case and thus no coverage exists in this case." *Smith v. Tucson Airport Authority,* 180 Ariz. 165, 882 P.2d 1291 (Ct.App. 1994). Therefore, partial summary judgment is proper for the plaintiffs that the defendant cannot relitigate the issues of liability or the amount of damages. Thus, as the insurance company asserted a defense of statute of limitations and vigorously argued the defense in the underlying action *Jobe v. Lee* in superior court, International is foreclosed from arguing that no liability existed as to Stegall and LSK in the underlying *Jobe v. Lee* litigation for failure to advise of the statute of limitations.

█ Plaintiffs also argue that they are entitled to partial summary judgment that

tax benefits and profits cannot be considered when assessing the reasonableness of the settlement. Damages in a tax malpractice case are the difference between what the plaintiff would have owed if the tax returns had been properly prepared and they owe now because of the professional's negligence, plus incidental damages. *Thomas v. Cleary,* 768 P.2d 1090, 1091–92 n. 5 (Alaska 1989). The injured plaintiff in a tax malpractice action may recover: (1) the taxes paid after audit, appeal and/or settlement attributable to the negligence; *Thomas,* 768 P.2d at 1092; (2) interest paid on those taxes; (3) prejudgment interest on taxes and interest paid, *Wynn v. Estate of Holmes,* 815 P.2d 1231, 1235–36 (Okla.Ct.App.1991); (4) professional fees incurred in defending the audit, *Thomas,* 768 P.2d at 1092; (5) all fees paid to a lawyer who acts while in a conflict situation, *Day v. Rosenthal,* 170 Cal.App.3d 1125, 217 Cal.Rptr. 89, 113 (Ct.App.), *cert denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); and (6) additional taxes a plaintiff will incur on receipt of the damages award. *Oddi v. Ayco Corp,* 947 F.2d 257 (7th Cir. 1991). Tax benefits are not considered when determining a party's damages. *Seely v. McEvers,* 115 Ariz. 171, 564 P.2d 394 (Ct. App.1977). *See also Billings Clinic v. Peat Marwick, Main & Co.,* 244 Mont. 324, 797 P.2d 899 (1990); *Randall v. Loftsgaarden,* 478 U.S. 647, 660, 667, 106 S.Ct. 3143, 3151, 3155, 92 L.Ed.2d 525 (1986) (securities fraud); *Fullmer v. Wohlfeiler & Beck,* 905 F.2d 1394, 1402 (10th Cir.1990); *DePalma v. Westland Software House,* 225 Cal.App.3d 1534, 276 Cal.Rptr. 214, 217 (1990). Thus, as a matter law, evidence of tax benefits or other economic benefits, if any, received by the Jobes is irrelevant and cannot be presented by the defendant and the plaintiff is entitled to partial summary judgment on this issue.

■ Moreover, to allow International to reopen the prior case, after conducting discovery and hiring experts to present evidence that was not known to the parties in the underlying litigation in *Jobe v. Lee,* would defeat the purpose of *Damron* agreements. Thus, plaintiffs are entitled to partial summary judgment that the defendant is limited to only the facts that were before the trial

court at the time of the settlement in consideration of whether the settlement was reasonable, to the extent that such issue could be considered in this action.

■ In addition, relevant to the reasonableness of settlement, the insurance company had ample notice of the action and the potential entry of a *Damron.* Yet, it did not intervene in the state court action to challenge the reasonableness of the settlement. Therefore, the defendant *waived* any right it had to challenge the reasonableness of the settlement of the state court action and must come forward with evidence of collusion or fraud to avoid payment of the settlement. *See Morris,* 741 P.2d at 252.

## II. Are plaintiffs entitled to partial summary judgment regarding recision because International waived any right to rescind?

■ Plaintiffs argue that International waived any right to rescind that might have existed under the contract.

■ Arizona follows the rule that "a person seeking rescission of a contract must act promptly under the existing circumstances in stating and intent to rescind:"

> One who has knowledge of fraud as grounds for rescission, but continues to treat the property as his own is deemed to have waived the fraud, at least for purposes of rescission. [citation omitted]. The opportunity to obtain rescission based upon fraud or misrepresentation is lost if the injured party having acquired knowledge, actual or constructive, of the fraud, manifests to the other party an intention to affirm or exercises domination of things, restoration of which is a condition of his power of avoidance.

*Dewey v. Arnold,* 159 Ariz. 65, 71, 764 P.2d 1124, 1130 (Ct.App.1988). These principles apply to insurers. *CenTrust Mtg. Corp. v. PMI Mtg. Ins. Co.,* 166 Ariz. 50, 56, 800 P.2d 37, 43 (Ct.App.1990); *Verex Assurance, Inc. v. John Hanson S. & L., Inc.,* 816 F.2d 1296 (9th Cir.1987). In *Verex,* the Ninth circuit, applying Oregon law, clearly explained waiver in an insurance context:

Once an insurance company acquires knowledge of facts constituting grounds for rescission, it must promptly rescind the policy or the right to rescind may be waived. The essence of waiver is knowledge. If the insurer fails to act after it discovers the grounds for rescission, or after it learns facts which would put a reasonably prudent person on notice to inquire further, the right to rescind may be waived. [citations omitted].

*Verex,* 816 F.2d at 1302–03.

The undisputed facts establish that International concealed its intent to claim rescission for three years. A three-year delay is unreasonable as a matter of law. *Haley v. Continental Cas. Co.,* 749 F.Supp. 560 (D.Vt. 1990), *aff'd,* 927 F.2d 593 (2d Cir.1991) (three and one-half years). Moreover, although Arizona has not addressed the issue, other jurisdictions have found that an insurer waives any defenses not revealed to the insured when the claim is originally denied. *See eg. Hydro Systems, Inc. v. Continental Ins. Co.,* 929 F.2d 472, 476 (9th Cir.1991), citing *Intel Corp. v. Hartford Acc. & Indemnity Co.,* 692 F.Supp. 1171, 1180 (N.D.Cal. 1988). Such holding is consistent with the Arizona Department of Insurance regulations that require written disclosure of all bases for denial of the claim. A.C.R.R. R4–14–801(G)(1)(a) (1987). Therefore, the defendant waived any rescission claim and the plaintiff is entitled to summary judgment on the rescission counterclaims.[2]

**III. Is the defendant entitled to summary judgment?**

**A. Is the defendant entitled to summary judgment that it did not breach any express covenants in its policy because it had no duty to defend or indemnify the insured in connection with *Jobe v. Lee?***

International argues that it had no duty to defend the insured because: (1) the insured firm never requested a defense; (2) another carrier was defending; (3) a conflict of interest would have existed between it and the

firm regarding the control of the defense because of the coverage issues involved; and (4) *Jobe v. Lee* was not within or even potentially within, the coverage of the International policy. International argues that the Jobes cannot prove an element of their claim—that coverage existed under the policy.

**1. Did International have no duty to defend because the insured firm never requested a defense?**

▮▮▮▮ First, International's argument that the firm never requested a defense is without merit as it is clearly contrary to the undisputed facts in this case, including all of the letters, pleadings and court documents sent by Stegall to International. A liability insurer owes three duties to its insured including the express duty to defend, express duty to indemnify and implied duty to treat settlement proposals with equal consideration so as to avoid unwarranted exposure to the insured in excess of policy limits. *Arizona Property and Casualty Insurance Guaranty Fund v. Helme,* 153 Ariz. 129, 137, 735 P.2d 451, 459 (Ariz.1987). The duty to defend arises when the insurer is presented with a complaint. *Manny v. Estate of Anderson,* 117 Ariz. 548, 550, 574 P.2d 36, 38 (Ct.App.1977). An insurer's duty to defend is grounded in the insurance contract and arises when the allegations of a lawsuit bring the claims within the terms of the policy. *Pesqueria v. Factory Mut. Liab. Ins. Co.,* 16 Ariz.App. 407, 493 P.2d 1212 (Ct.App.1972). International's contract provides that International has a "duty to defend . . . any claim for damages against the Insured, even if such claim is groundless, false or fraudulent . . ." SOF 67. In addition, the policy provides that a "claim" is a "demand received by the Insured for damages." SOF 68.

The undisputed facts establish that LSK and Stegall received a demand for damages—a claim within the meaning of the contract—in December of 1989, during the policy period. The complaint alleged that the "attorneys" represented plaintiffs in numer-

---

**2.** Because the waiver is so clear, the court need not decide the issues of estoppel and lack of misrepresentation. However, the court would

decide that the defendant is estopped and cannot come forward with evidence to prove an element of its rescission claim.

ous tax matters, held themselves out to have special expertise; and had a duty to inform plaintiffs of matters which might adversely affect plaintiffs' interests. The complaint sought judgment against all defendants. On February 6, 1990, Stegall forwarded the complaint to International and informed International that the Jobes' attorneys believed the statute of limitations might be an issue in the case. On April 10, 1990, International confirmed that it had received notice of the Jobes' claims. International assured Stegall that it would provide any necessary defense to the firm if damages were incurred after February 10, 1986. On October 9, 1990, International was informed that Home, as a defense, was "trying to separate the interests of the Lee estate from the interests of the various law firms." The firm clearly requested coverage. On February 4, 1992, International was informed that discovery had revealed that the Jobes were alleging malpractice directly against the lawyers for acts subsequent to February 10, 1986. Stegall specifically asked International to get involved and discuss the matter with the Home lawyers. International did nothing. Rather, on April 29, 1992, International sent a letter informing Stegall that International was "excess" to Home. On May 8, 1992, Stegall responded and explained that the Home lawyers had raised the statute of limitations defense on behalf of Larry Lee and that the Jobes alleged Stegall was negligent by failing to advise the Jobes to file an action immediately to avoid the limitations defense. Stegall again asked International to talk to the Home lawyers. International did nothing. These facts clearly indicate that the insured requested a defense and summary judgment is not proper for the defendant on this argument.

## 2. Did International have no duty to defend because Home was defending?

■ Second, International argues it had no duty to defend the insured because another carrier was defending. However, this argument is also without merit. International cites no Arizona law that provides that one insurance company's duty to defend is met if another carrier is defending. This court will

not adopt such a rule. Rather, it agrees with those courts that have held that a duty to defend is an independent duty that exists, regardless of other companies duties to defend. *See Lujan v. Gonzales,* 84 N.M. 229, 501 P.2d 673 (Ct.App.1972).

Moreover, the undisputed facts establish that Stegall informed International early that the Home lawyers were separating the interests of the firm from Lee's estate. Stegall also informed International that the defenses raised by the lawyers hired by Home, including statute of limitations, waiver and estoppel, caused the Jobes to assert theories of liability against Stegall and the firm for malpractice. International failed to act at each stage. Clearly, the defense by Home was not a defense of Stegall or the firm. Therefore, summary judgment is not proper for the defendant on this ground.

## 3. Did International have no duty to defend because of conflict of interest?

■ Third, International argues it had no duty to defend the insured because a conflict of interest would have existed between it and the firm regarding the control of the defense because of the coverage issues involved.

In cases in which, on the facts, the insurer has reason to believe the policy does not cover the insured, the interests of the insured and insurer may diverge. In these cases, the insurer should not control the defense. Rather, the liability issue can be resolved in "a declaratory judgment brought in advance of the third party's action or proceedings on garnishment following the trial ..." *Kepner v. Western Fire Ins. Co.,* 109 Ariz. 329, 332, 509 P.2d 222, 224–25 (1973). "If the insurer refuses to defend and awaits the determination of its obligation in a subsequent proceeding, it acts at its peril, and if it guesses wrong, it must bear the consequences of its breach of contract." *Kepner,* 509 P.2d at 225. Such conflict situation may also be remedied by sending a proper declination of coverage or reservation of rights letter and advising the insured to obtain independent counsel, paid by the insurance company. *Joseph v. Markovitz,* 27 Ariz.App.

122, 128, 551 P.2d 571, 577 (1976). Thus, as a matter of law, a conflict of interest does not extinguish an insurers duty to defend the insured [3] and summary judgment is not proper for International on this claim.

### 4. Did International have no duty to defend because there was no coverage under the policy?

 Finally, International argues it had no duty to defend the insured because *Jobe v. Lee* was not within or even potentially within, the coverage of the International policy. There is no obligation to defend if there is no coverage under the policy. *Manny v. Estate of Anderson*, 117 Ariz. 548, 550, 574 P.2d 36, 38 (App.1977). Thus, the Court must determine whether coverage existed.

#### a. Endorsement 2 of the policy

 International first argues that Endorsement 2 of the policy precludes coverage and that the Jobes cannot prove that coverage existed under the policy. International focuses only on the tax advice of Lee provided from 1979 through 1984 and argues that the later acts of Stegall and the firm arose from Lee's acts and are excluded by Exclusion 2. The Jobes respond that International's argument "stretches the concept of causation to the point where every act is causally connected to ever subsequent event" and that the later alleged malpractice acts by other members of the firm did not arise from Lee's acts.

 Where the language employed is unclear and can be reasonably construed in more than one sense, an ambiguity exists in a policy, the language should be examined from the viewpoint of one not trained in the law or the insurance business. This rule applies with even greater force where the ambiguity appears in an exclusionary clause. *State Farm v. Gibbs*, 139 Ariz. 274, 279, 678 P.2d 459, 464 (Ct.App.1983). In this case the key phrase is "arising from or attributable to" because Endorsement 2 provides:

this Policy does not cover any claim or claims arising from or attributable to or based upon any act(s), error(s), omission(s), or personal injury(ies) committed or alleged to have been committed prior to the following retroactive date: 02/10/86.

International cites Arizona cases that construe "arising out of" broadly in finding coverage under the general terms of the policies. However, in all of these cases the phrase was broadly construed to find coverage, not to deny coverage. The broad interpretation does not apply to broadly construe the phrase in an exclusion to coverage. Rather, exclusions are narrowly construed. Consistent with this narrow construction, Stegall's alleged failure to advise the Jobes of the statute of limitations, waiver, estoppel and other defenses did not occur because Lee negligently structured transactions several years before. Rather, they were new, additional alleged acts of negligence by other members of the firm and summary judgment is not proper for the defendant on this claim. *See eg, Doe v. Illinois State Medical Inter. Ins. Exchange*, 234 Ill.App.3d 129, 174 Ill. Dec. 899, 599 N.E.2d 983 (1992); *Guaranty Nat'l Ins. Co. v. International Ins. Co.*, 994 F.2d 1280 (7th Cir.1993); *Chautauqua v. International Ins. Co.*, 724 F.Supp. 1112 (W.D.N.Y.1989).

#### b. Claims made and reported requirement

 International argues that the post–1986 acts are not covered as they were not made or reported during the policy period. The International policy provides:

> The Company shall pay on behalf of the Insured all sums in excess of the deductible which the Insured shall become legally obligated to pay as damages as a result of claims first made against the Insured and reported to the company in writing during the Policy period by reason of any act, error, omission or personal injury arising out of professional services rendered or which should have been rendered by the Insured or by any person for whose acts, errors, omissions or personal injuries of

---

**3.** Such a holding would potentially eliminate the duty to defend as the insurer would only have to assert no coverage and a potential conflict.

the Insured is legally liable, and arising out of the conduct of the insured's professional as a Lawyer or Notary Public.

A claim is defined as "a demand received by the insured for damages, including, but not limited to, the service of suit or institution of arbitration proceedings against the insured." The policy provides for "potential" claims:

> If, during the policy period, the Insured first becomes aware of an act ... and gives written notice ... during the policy period, any claim subsequently made ... shall be considered to have been made during the policy period.

The policy further provides that:

> written notice of a potential claim shall include:
>
> A) the specific act, error or omission or personal injury; and
>
> B) the injury or damage that may reasonably result; and
>
> C) the circumstances by which the Insured became aware of the act ...

The undisputed facts establish that the policy expired February 10, 1990. International received notice of the claim approximately December 6, 1989 when LSK applied for renewal of the policy. International responded by declining to renew the policy. Within the policy period, Stegall also forwarded the complaint which requested damages for numerous acts of malpractice of the "attorneys." On February 6, 1990, Stegall informed International that the statute of limitations could be an issue. Thus, the lawsuit was first reported during the policy period. As soon as Stegall became aware through discovery of the other claims against the firm, he forwarded the discovery to International. Under the "potential claims" provision set forth above, these claims are considered to have been made during the policy period. Therefore, the defendant is not entitled to summary judgment that there is no coverage because the claims were not made or reported during the policy period.

4. To the extent that this argument falls under the defendant's recision claim, as set forth above, that claim was waived by International.

## c. Exclusion B

■ International argues that there is no coverage under Exclusion B of the policy.[4] "Exclusion B" excludes coverage under the policy for "any claim based upon or arising out of any act, error, omission or personal injury occurring prior to the effective date of this policy if the insured at the effective date knew or could have reasonably foreseen that such act, error, omission or personal injury might be expected to be the basis of a claim or suit." Neither party cites any Arizona law regarding this issue. This Court adopts the reasoning of the Eastern District of Missouri in *General Acc. Ins. Co. v. Trefts,* 657 F.Supp. 164, 167 (E.D.Mo.1987):

> The Court recognizes that virtually any circumstance, act, error, or omission in the course of any legal representation could result in a professional liability claim being made against the lawyer by a disappointed client, but that not all do. The court construes Question 9(d) of the application[5] at issue here to require disclosure of circumstances, acts, errors, or omissions that could result in a professional liability claim only in those circumstances when a client has given to the lawyer some indication through a complaint or expression of dissatisfaction with his services that a claim might or would be made.

*Trefts,* 657 F.Supp. at 167.

The undisputed facts establish that on January 20, 1989, Stegall completed the application stating that he was not aware of any circumstance, act, error or omission which may result in a claim against them. At that time, Stegall and the firm knew about the tax audit and represented the Jobes in the administrative and subsequent appeals. The Jobes never expressed any dissatisfaction with the services until after August of 1989, after they reached a settlement with IRS. As soon as Stegall became aware of the potential claim, he sent a copy of the complaint to International. As of January 20, 1989, the Jobes had not expressed any dissat-

5. "Does any lawyer ... know of any circumstances, act, error or omission that could result in a professional liability claim?"

isfaction to Stegall or the firm which would indicate that a claim might be made against the firm. Therefore, there was insufficient prior knowledge to bar coverage and summary judgment is not proper for the defendant.

**B. Is the defendant entitled to summary judgment that it did not breach any implied duty with regard to *Jobe v. Lee?***

 International argues that it did not breach any implied duty with regard to *Jobe v. Lee* because no duty for "equal consideration" arose as International did not defend or employ attorneys to represent International and the firm.

 The insurer owes the insured an implied duty to treat settlement proposals with equal consideration. *Nichols v. State Farm*, 175 Ariz. 354, 357, 857 P.2d 406, 409 (Ct.App.1993). This duty arises from the duty of good faith and fair dealing implied in every contract. *Clearwater v. State Farm*, 164 Ariz. 256, 259, 792 P.2d 719, 722 (1990). An insurer's duty to give equal consideration to the interest of the insured does not arise until a conflict of interest develops between the insurer and its insured. *Fulton v. Woodford*, 26 Ariz.App. 17, 545 P.2d 979 (1979). The classic situation in which a conflict of interest arises is when the insurer refuses a settlement offer to settle within policy limits. However, in *Fulton*, the Arizona Supreme Court recognized that another area of potential conflict of interest exists "where there is a high potential of claimant recovery and a high potential of damages exceeding policy limits." The Court stated:

> the claimant may not be interested in settlement negotiations, especially where a financially responsible insured is present. In such a case, the insurer has nothing to lose by "going for broke" while the insured stands to suffer financially unless the matter is settled within policy limits or close thereto, which settlement negotiations are completely within the hands of the insurer. Obviously, a conflict of interest under these circumstances is present between the insured and his insurer. Under these circumstances, the better reasoned cases im-

pose upon the insurer the obligation to initiate and attempt settlement and the failure to do so may constitute "bad faith" which would subject the insurer to liability in excess of the policy limits.

*Fulton*, 26 Ariz.App. at 22, 545 P.2d at 984. *See also Holt v. Utica Mut. Ins. Co.*, 157 Ariz. 477, 482–83, 759 P.2d 623, 628–29 (1988). Thus, the implied duty for equal consideration arises in a conflict situation, which International asserted existed in this case. Moreover, the duty to give equal consideration exists separate and apart from the duty to defend. *Equity Gen. Inc. Co. v. C.A. Realty Co.*, 148 Ariz. 515, 519, 715 P.2d 768, 772 (Ct.App.1985). Therefore, as a matter of law, the undisputed facts establish that International not only had a duty of "equal consideration" but breached that duty and summary judgment is proper for the plaintiffs rather than the defendant on this claim.

**C. Is the defendant entitled to summary judgment because execution of the *Damron* agreement precludes the *Jobe's* claim against International?**

International argues that execution of the Damron Agreement precludes the claim against International as the policy provides that the insured shall not settle claims without prior written consent. As thoroughly discussed above, the entry of the insured into a *Damron* agreement when an insurance company has refused to defend or reserved its right does not result in a breach of the cooperation clause of the insurance agreement. *Damron*, 460 P.2d 997; *Morris*, 741 P.2d at 246–52. Thus, the defendant is not entitled to summary judgment on this issue.

**D. Is the defendant entitled to summary judgment because it did not commit the tort of bad faith?**

 International argues that it did not commit bad faith because it had no duty to defend, settle or indemnify; its conduct was not tortious as a matter of law; and that any alleged bad faith did not cause the insured to lose any settlement opportunity. First, as set forth above, International had a duty to defend and it has not shown that there was

no coverage under the policy. Moreover, under Arizona law, a breach of an express contractual duty to defend, express contractual duty to indemnify or implied duty to give equal consideration is *not* required for a bad faith claim. *Deese v. State Farm,* 172 Ariz. 504, 509, 838 P.2d 1265, 1270 (1992); *Rawlings v. Apodaca,* 151 Ariz. 149, 155–57, 726 P.2d 565, 571–73 (1986). Thus, International's first argument is without merit and summary judgment is not proper for International.

International also argues that its conduct was not tortious as a matter of law. An insurer is liable for bad faith tort damages if it acted intentionally without a founded belief that its conduct was permitted under the terms of the policy. *Rawlings,* 726 P.2d at 576. The founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable. *Id. See also, Lange v. Penn Mut. Life Ins. Co.,* 843 F.2d 1175, 1182–83 (9th Cir.1988); *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986). The undisputed facts in this case establish that despite numerous requests for intervention International consistently did nothing. Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith. *Rawlings,* 726 P.2d at 578. As such, plaintiffs have established as a matter of law that International acted in bad faith and the defendant is liable for tort damages. Therefore, summary judgment is not proper for the defendant on this issue.

International further argues that plaintiffs cannot prove that it committed outrageous acts or had an evil mind to obtain punitive damages. Punitive damages for bad faith are recoverable only when the facts establish that the defendants' conduct was aggravated, outrageous, malicious or fraudulent. *Rawlings,* 726 P.2d at 578. Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise to the level required by the punitive damage rule. *Id.* To obtain tort damages, plaintiff must prove only that the defendant failed to ascertain the true facts and thus acted without or indifferent to the reasonable basis required for denying the claim. *Id.* To obtain punitive damages, plaintiff must also show that the evil hand that unjustifiably damaged the objectives sought to be reached by the insurance contract was guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the insured. *Id.* When a defendants' motives are shown to be so improper or its conduct so oppressive, outrageous or intolerable that such an "evil mind" may be inferred, punitive damages may be awarded. *Id.*

The Arizona Supreme Court further explained that:

> The key is the wrongdoer's intent to injure the plaintiff or his deliberate interference with the rights of others, consciously disregarding the unjustifiably substantial risk of significant harm to them. [citation omitted] While the necessary "evil mind" may be inferred, it is still this "evil mind" in addition to the outwardly aggravated, outrageous, malicious, or fraudulent conduct which is required for punitive damages. We hold that before a jury may award punitive damages there must be evidence of an "evil mind" and aggravated and outrageous conduct.

*Linthicum,* 723 P.2d at 680.

In *Bradshaw v. State Farm,* 157 Ariz. 411, 758 P.2d 1313 (1988), the Arizona Supreme Court affirmed a $1 million punitive damages award finding that it was supported by evidence that:

> State Farm acted intentionally, without subjective belief in the merits of the lawsuit it instituted, and that it was aware its action was unfounded and untenable ... Thus, the jury could have concluded that State Farm knowingly acted improperly to serve its own interest and consciously disregarded a "substantial risk of significant harm to others."

*Bradshaw,* 157 Ariz. at 422–23, 758 P.2d at 1324–25.

See also, Thompson v. Better–Bilt Aluminum Prod., Co., 171 Ariz. 550, 556, 832 P.2d 203, 209 (1992).

Based on the above standard, this Court cannot say as a matter of law that punitive damages are not appropriate in this case. The undisputed facts establish that International, without investigation, decided that Home would be the primary carrier unless International was forced to revise its position. However, such a position is unenforceable on public policy grounds. See eg. State Farm v. Bogart, 149 Ariz. 145, 148, 717 P.2d 449, 452 (1986). In addition, despite numerous updated letters and requests for help from the insured, International did nothing. The undisputed facts also establish that there is evidence regarding a letter from a claims adjustor that was never received by the insured. In deposition testimony regarding the letter, Schirott testified that he sent the letter but did not follow up. In a later affidavit in this case, he stated that the letter was prepared but not sent. The jury could infer from this conflicting evidence that International attempted, after the fact, to create evidence that it investigated. Based on all of this evidence, a jury could make such a finding that punitive damages were proper; the punitive damages claim must go to the jury and summary judgment is not proper for the defendant on this claim.

 Finally, International argues that its alleged bad faith did not cause the loss of a settlement offer. However, International comes forward with no evidence to support this proposition. If an insurer erroneously denies coverage and refuses to defend it does so at its own peril and is liable on any judgment entered against its insured. Rogan v. Auto–Owners Ins. Co., 171 Ariz. 559, 832 P.2d 212 (App.1991). Such liability should not exceed policy limits, absent refusal of a reasonable settlement offer. Id. If International had become involved in settlement, the case could have settled within the policy limits. International admits that it refused to settle for the policy limits. In fact, International refused to even participate in the settlement. Therefore, its liability is not limited to the policy limit of $1 million

and summary judgment is not proper for the defendant on this claim.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiffs' motion for partial summary judgment regarding recision [doc 104] is granted. The Plaintiffs are entitled to partial summary judgment on Counts one and four of the defendant's counterclaim.

(2) Plaintiffs' motion for partial summary judgment regarding the measure of damages [doc 106] is granted. Plaintiffs are entitled to partial summary judgment that the measure of damages cannot be relitigated and no evidence that was not before the trial court can be presented to this court.

(3) Plaintiffs' motion for partial summary judgment regarding relitigation of the underlying case [doc 108] is granted. Plaintiffs are entitled to partial summary judgment that the liability issue cannot be relitigated and no evidence that was not before the trial court can be presented to this court.

(4) Defendant International's motion for summary judgment [doc 125] is denied. Plaintiffs are entitled to summary judgment on counts two and three of the defendant's counterclaim.